KRAUS vs. THE SENTINEL COMPANY.

*April 9 — May 15, 1884.*

*Libel: Innuendoes: Demurrer.*

1. If a publication is libelous and actionable on its face, the fact that the innuendoes enlarge the meaning of words and attribute to them a signification they will not bear, does not render the complaint subject to demurrer.

2. The publication here in question (connecting the plaintiff's name with alleged gross frauds in the registry of voters) is *held* to be libelous and actionable upon its face.

APPEAL from the Circuit Court for *Milwaukee* County.

Action for libel. The complaint alleges that the defendant was the publisher of a newspaper of large circulation, called the "Republican-Sentinel;" that the plaintiff, who, until the publication of the alleged libel, had always maintained a good reputation and credit, was one of the publishers and proprietors of the "Seebote," a newspaper published in the city of Milwaukee, and therein was a partner of one P. V. Deuster; that said P. V. Deuster was a candidate for representative in congress at the election to take place November 7, 1882; that the plaintiff was supporting said candidacy, and that the defendant through its newspaper was opposing the same; and that on November 4, 1882, the defendant in said newspaper, the "Republican-Sentinel," pub-

lished the defamatory articles in question, each of which forms the basis of a separate cause of action. The first of said articles was as follows:

" A Gigantic Fraud. How the First Ward Registry has been Corrupted. A List of the Illegal Voters. Over Two Hundred False Names Already Found. Bogus Polack Names Used. Details of the Boldest Attempt Ever Made to Corrupt the Election. Mike Kraus' List of Polish Names.

" When Mike Kraus, the partner of P. V. Deuster, came before the Board of Registration of the First ward with a list of 250 Polack names for registration, the suspicions of the Republicans were aroused. It was thought to be very remarkable that Mike should have information as to the non-registry of 250 Polacks on the very first day of the session, and before the results of the day were known. It was inconceivable that Mike Kraus should not only know that the 250 Polack names were not on the list, but should also know that none of them had been presented on that day for registration. It was inconceivable that he should have pre-pared the list on that day after looking at the registrations. It was apparent that the First ward list was entitled to a close inspection by Republicans. The presumption of fraud was reasonable — but the facts as developed by the reporters of the *Republican-Sentinel* show a fraud of such magnitude that the community may well be appalled at the boldness of the outrage, and the legal voters of the city may well question the use of elections if they are to be deprived of the value of their votes by such frauds as this indicates. On the registry list of the First ward appear the names of over 200 Polacks who have no existence; their residences are located, in a large number of cases, where there are no houses; as many as ten voters are registered as living in a certain house into which that number of persons cannot be crowded. The

boldest feature of the gigantic fraud is the location of ficti-tious persons whose names begin with 'B,' for instance, on one street, and others whose names begin with 'K' on another street — so that from the list of fictitious names on the registry it appears that most of the Polacks are ar-ranged in the places of residence in alphabetical order. The investigation has not been completed, and it is reasonable to believe that it is far more extensive than even the long list herewith presented shows. So far as this list is concerned the evidence of fraud is complete and damning. Never, in the history of this or any other city, has a fraud of such enormous proportions been so unblushingly perpetrated; never was there such crushing evidence of a cold-blooded purpose to defeat the will of the legal voters of any city. The frauds of the notorious Eph Holland, of Cincinnati, sink into insignificance in comparison with this. Even under the infamous Tweed dynasty in New York Democratic politics there was never any fraud as bold as this attempted. So far, the discoveries are limited to the First ward list, but it is a fair inference that the same state of affairs exists in the Polack region of the South Side. The case as it stands is that over 200 fictitious Polack names have been placed on the First ward list. The clear purpose was to bring Polacks from the South Side, after they had voted there, to vote again in the First ward. We now present the history and facts of the case, and leave it with the voters of Milwaukee to say whether the man in whose interest this gigantic fraud has been perpetrated shall represent this community in Con-gress.

"HOW IT WAS WORKED UP.

"As we have said, when Mike Kraus, the partner of P. V. Deuster, presented a list of 250 Polack names for registra-tion, suspicion was aroused, and reporters of the *Republican-Sentinel* set to work to investigate the First ward registry list. The first thing to attract attention was the dispropor-

tionate number of 'B's' on Brady street, 'K's' on Sobieski street, etc.; then the unusual number of voters at one house. A list of names, comprising as far as practicable the list made out by Mike Kraus, the partner of P. V. Deuster, was drawn up, and reporters were detailed to visit the houses in which the alleged persons were reported as living, and to make inquiries as to their existence."

[The article then proceeds to state the evidence collected by the reporters to show frauds in the registry list, giving a list of Polish names which are stated to be either fictitious or not to belong in the First ward. It concludes:]

"If the intelligent citizen can review these facts with calmness he will see that the evidence of fraud is simply irresistible. It is unprecedented in the history of politics in Milwaukee. The clear purpose of this outrage is the overthrow of the will of legal voters by the use of the very worst element in the city. The success of P. V. Deuster under these circumstances would be the success of fraud," etc.

The second article was as follows:

## "A FRAUDULENT REGISTRY.

"We publish this morning the details of one of the most bold, unconscionable, and nefarious register frauds ever detected in this country. Its purpose was to assure the re-election of the 'introducer of the Deuster bill,' and the Democratic county ticket. This end was to be attained by wholesale fraudulent voting on election day, and, to prepare the way for the successful execution of the plot, hundreds of fictitious or nonresident names have been placed on the registry list in the First ward. Probably similar frauds have been perpetrated on the registry in some other wards, but the investigation has thus far been extended only to the First ward and is not yet completed. It is further understood that the fictitious names on the list in the First ward

were placed there by Mike Kraus, the business partner of Mr. Deuster, and one of the active managers of his canvass.

•   •   •   •   •   •   •   •   •   •   •

"It must be conceded that the Deuster managers are enterprising. They have tried to buy the Trades Assembly. They seek to organize all the beer, whisky, and saloon interest in his favor. Next they raise the banner of the cross and declare that Deuster must be elected to vindicate the Catholic church and rebuke its enemies. And, not satisfied with these efforts, it would appear that they have been organizing with a view to perpetrating one of the most extensive, shameless, and scandalous election frauds ever heard of outside of South Carolina or Louisiana. Such disgraceful and demoralizing trickery should, and no doubt will, receive a sharp and merited rebuke at the polls."

The damages of the plaintiff are laid at $30,000. The defendant demurred generally to each cause of action stated and to the whole complaint, and appealed from an order overruling the demurrer.

For the appellant there was a brief by *Wells, Brigham & Upham*, and oral argument by *Mr. Upham*. They contended, *inter alia*, that the demurrer should have been sustained because the articles, in so far as they charge frauds in the registry, do not refer to the plaintiff, and make no charge against him. The charge of presenting for registry and placing illegal names upon the registry imports no crime. It is an impossibility under the statute. R. S., secs., 20–24. The use of the word *fraud* does not make the article libelous. *Bennett v. Williamson*, 4 Sandf., 64; *State v. Farley*, 4 McCord, 318.

*Jas. G. Jenkins*, of counsel, for the respondent.

TAYLOR, J. This is an action for libel. The appellant demurred to the complaint on the ground that it does not state facts sufficient to constitute a cause of action. The

complaint is of great length, covering thirty-four pages of the printed case, a large portion of which is composed of innuendoes, many of which are of doubtful utility, and unnecessary to a full understanding of the meaning of the libelous publication. It would seem that the demurrer was aimed at the innuendoes rather than at the text of the publication. After a careful reading of the publication, which is the foundation of the action, we are satisfied that it is of a grossly libelous character if untrue. Its mere production as evidence, and proof of publication, would establish a cause of action against the appellant.

The fact, if it be a fact, that some of the voluminous innuendoes attribute a meaning to the words published which they will not bear, is no ground for sustaining a demurrer to the complaint for the reason that it does not state facts sufficient to constitute a cause of action. The innuendoes which are objectionable may be treated as surplusage, and the letter of the publication still be libelous. The rule is undoubtedly well stated in *Fry v. Bennett*, 5 Sandf., 65, where Justice DUER, speaking for the court as to the office of the innuendo, says: " If it enlarge the sense materially, which can only happen when the sense which it attributes to the words is that which alone renders them actionable, the proper course of the defendant is to demur; and if the court be of the opinion that the innuendo is not justified by the antecedent facts to which it refers, and that, rejecting it, the words are not actionable, it is certain that the judgment will be rendered in his favor. . . . When the words, although their sense may be enlarged by the innuendo, are plainly actionable upon their face, a denial of the truth of the innuendo would be frivolous and nugatory. As, rejecting the innuendo, the cause of action would remain, the denial would be immaterial as an issue of fact, and groundless as an issue of law." Admitting that the innuendoes in the complaint in the case at bar extend the

meaning of the words of the publication beyond their fair and proper construction, such innuendoes do not make the complaint subject to demurrer for the reason that it does not state facts sufficient to constitute a cause of action, if the words of the publication are actionable in themselves, rejecting the innuendoes. As said above, we are clearly of the opinion that the publication is libelous and actionable on its face without the aid of the innuendoes.

*By the Court.*— The order of the circuit court is affirmed, and the cause remanded for further proceedings.