SCOFIELD, Respondent, vs. MILWAUKEE FREE PRESS COM-
PANY and others, Appellants.

*October 7—October 24, 1905.*

*Libel: Newspaper publication: When libelous* per se: *Pleading: In-*
*nuendoes.*

1. A newspaper publication is libelous *per se* if it tends to degrade
   or disgrace a person generally or to subject him to public dis-
   trust, ridicule, or contempt.
2. After publication in a newspaper of the charge that one S. when
   a candidate for the senate of the United States used large
   sums of money to promote his candidacy, distributing it before
   election among candidates for the legislature by which a United
   States senator was to be chosen, a subsequent publication in
   the same paper referring to such moneys as "the price for
   a senatorship," and charging plaintiff with participation, as
   "distributing agent," in the said acts of S., is libelous, even
   though it does not charge plaintiff with any crime.
3. An innuendo in the complaint in such case asserting that the
   publication charged a crime may, if untrue, be treated as sur-
   plusage.
4. An innuendo asserting that the meaning of certain statements
   relative to acts of the plaintiff as "distributing agent" for S.
   was to charge the purpose of "corrupting and bribing" legisla-
   tive candidates, may reasonably be held to refer merely to
   bribing in the colloquial sense, without necessarily importing
   all the technical elements of the crime of bribery.
5. After stating that certain money of S. had been returned to
   plaintiff by one to whom he had sent it, the publication con-
   tinued: "It would be interesting to know how far the money
   went on its return journey." *Held*, that these words were
   capable of libelous meaning, as insinuating a suspected conver-
   sion or misappropriation of the money by plaintiff.

APPEALS from orders of the superior court of Milwaukee
county: J. C. LUDWIG, Judge. *Affirmed.*

Appeals by the several defendants from orders overruling
their general demurrers to the complaint, which alleged the
incorporation of the *Milwaukee Free Press Company,* the
official relation thereto of the several individual defendants,

VOL. 126 — 6

and that they directed and participated in and consented to all of the publications complained of, and further alleged that factions existed in the Republican party, to one of which the plaintiff belonged, and to the support of the other were devoted the newspaper published by the *Milwaukee Free Press Company* and the several defendants; that plaintiff was a private individual, occupying no official place, and in no candidacy at the times mentioned, and that in the year 1887 he was a member of the state senate in the legislature of Wisconsin, at the session of which Philetus Sawyer was a candidate for election to the United States senate, and was elected, with the support and vote of the plaintiff. Further, that for many years the Free Press had pursued a course of malicious attack and defamation against this plaintiff, and that on September 21, 1904, it published an editorial under the title, "Come High, but Must be Had," asserting, in substance, that Sawyer paid a big price for the senatorship; that it was reported that every Republican candidate for the legislature that year had Sawyer money in his pocket, distributed to them by personal agents in sums ranging from $500 to $1,500 to each, with the explanation that Sawyer was very anxious that the state should go Republican, and that the payment was "just to help pay the legitimate, you know;" and that in this way, and others, Mr. Sawyer had not far from $200,000 invested in the senatorship when he went down to Madison to claim it, and there was no one to dispute his ownership. This publication was not alleged to be libelous, but complaint further alleged that on the following day, September 22d, the defendants, with intent to defame and injure plaintiff, maliciously published the following false and defamatory matter:

"THE PRICE FOR A SENATORSHIP.

"*To the Editor:* It probably would not be difficult to obtain many specific facts of great interest to those who are curious as to the cost in this state of a United States senatorship, as illustrated in the cost to the late Senator Sawyer.

"Ex-Gov. *Scofield*, then a state senator, was made a dis-tributing agent for the 'Mare of Oshkosh.' One day, while in the office of a Door county business man, a messenger came in and asked for a private interview with the merchant, who was in close touch with the Republican candidate for the as-sembly.

"When the messenger departed the merchant showed me a bunch of bank notes labeled '$500,' and, while he said little, I could see that he was thoroughly disgusted. He plainly told me that it was *Sawyer money,* and had been sent to him by *Scofield.*

"Soon after election I again called at this same man's of-fice. He went to his safe, took out the identical package, from which the label had not been removed, and prepared it to send by express to Senator *Scofield.* He remarked that he was glad he did not have to use it.

"The Free Press is undoubtedly very close to the truth as to the amount sent each Republican candidate for the legis-lature and then even, very likely, few cases like the above where the money was returned. It would be interesting to know how far the money went on its return journey.

"[Signed]                .                    CITIZEN."

By innuendoes, the assertions that plaintiff was distribut-ing agent and that plaintiff sent the $500 to a Door county merchant meant to charge plaintiff with distributing and pay-ing money for the purpose of corrupting and bribing mem-bers of the legislature, and a candidate for the assembly, in order to secure their votes for said Sawyer as United States senator. The final clause of this article was alleged to mean and insinuate that plaintiff received the money from the merchant and fraudulently converted it to his own use. The intent of the whole article was alleged to charge the plaintiff with bribing legislators and candidates to vote for Mr. Saw-yer, "contrary to the statutes of the state of Wisconsin and in violation of the criminal code of said state." It is also alleged, but not as a separate libel, that on the following day, the plaintiff having declared his purpose to bring a libel ac-tion, the defendants published an editorial referring to the

commencement of another libel case against them by one Barney Augustus Eaton, who at once discontinued it, and, though he was a senator at that time, has not been in any higher office since. The plaintiff alleges malice and the intent to injure him in the estimation of his neighbors and of the people of the state, who had theretofore trusted him and elected him to the office of governor.

For the appellants the *Milwaukee Free Press Company, Harry P. Myrick,* and *Theodore Kronshage, Jr.,* there was a brief by *Kronshage & McGovern,* a reply brief by *Kronshage, McGovern & Corrigan,* and oral argument by *W. D. Corrigan.*

For the appellant *Horace A. J. Upham* there was a brief by *Turner, Pease & Turner,* and oral argument by *W. J. Turner.*

For the respondent there was a brief by *Quarles, Spence & Quarles,* attorneys, and *A. L. Cary,* of counsel, and oral argument by *George Lines.*

DODGE, J. The editorial of September 21st is clearly capable of being understood to charge that during the political campaign of 1886, when were to be elected the legislators upon whose suffrages depended the outcome of his own candidacy for the United States senate, Mr. Sawyer paid out to legislative candidates very large sums of money for the purpose of so securing their support and his election, for it is stated as a "price paid" for the senatorship, and that when legislature convened he claimed and had undisputed ownership of it; also that he thereby "bought and paid for what he got." This idea is carried forward into the article of September 22d by the heading thereof, "The Price for a Senatorship," and again by reference to such expenditures in the article as the "cost of a United States senatorship." Then, in the latter and alleged libelous article, the plaintiff is declared to have participated in Mr. Sawyer's acts, for, refer-

ring to the previous editorial, it states that plaintiff was Saw-
yer's distributing agent in the northern part of the state.
These assertions are not qualified or weakened by any of the
context, but enforced by one illustrative instance.

Stopping here for the moment and disregarding all attempts
of the plaintiff by innuendo to give special significance to
the published article, is the plain and ordinary meaning of
the words as above stated libelous? To be so they need only
tend to degrade or disgrace the plaintiff generally, or to sub-
ject him to public distrust, ridicule, or contempt in the com-
munity where, as alleged, he had theretofore been regarded
with high confidence and esteem—so high that he had twice
been elected governor of the state. Being printed, they need
neither allege any crime nor apply to any particular business
situation wherein he might be specially subject to injury.
*Bradley v. Cramer,* 59 Wis. 309, 18 N. W. 268; *Moley v.
Barager,* 77 Wis. 43, 45 N. W. 1082; *Street v. Johnson,* 80
Wis. 455, 50 N. W. 395; *Allen v. News Publishing Co.* 81
Wis. 120, 50 N. W. 1093; *Buckstaff v. Viall,* 84 Wis. 129,
54 N. W. 111; *Pfister v. Sentinel Co.* 108 Wis. 572, 84 N.
W. 887; *Gross Coal Co. v. Rose, ante,* p. 24, 105 N. W. 225.
Sweeping aside all of the technical refinements urged by ap-
pellants, such as the absence of any express understanding
with legislative candidates that they would favor the con-
tributor, or of any showing whether he expected they would
use his contributions for legitimate campaign expenses or
otherwise, we cannot doubt that the charge of using money in
large quantities in the hope and expectation of thereby pro-
moting his own candidacy for the United States senate is a
most degrading one to make against any public man. Such
an act is an assault upon a most essential principle of popu-
lar government, which, if to be successful, must assume the
free selection of officials on grounds of fitness. It pretends
a superiority before the law of the corrupt man of wealth over
the man of ability and integrity who, either from poverty or

principle, is debarred from similar means of securing support. It evinces a willingness to corrupt the legislature and dangerous looseness of morals. Gloomy, indeed, would be the prospect if we must believe that such conduct would not evoke general condemnation and disgust. But we do not believe it, nor did the defendants when they published the article under criticism. It would be puerile to suggest that such publication was in glorification of the memory of Senator Sawyer by laudation of his generosity and public spirit; but it was either that or an attempt to appeal to a well-apprehended sentiment against the lavish use of money by men seeking public preferment—commendable journalism if confined to the truth. Could we otherwise doubt of the existence of such a sentiment among the people of Wisconsin, that doubt must yield to the fact that they had long before this publication unambiguously evinced it by placing the stigma of actual criminality upon acts such as are charged against Sawyer, and, by complicity, against the plaintiff. In 1897 it was made a crime to contribute money toward the election expenses of legislative candidates except within the district of the contributor's own residence. Sec. 4543b, Stats. 1898.

We have already said enough to indicate our view that the words themselves, without any elucidation by way of innuendo as to the charge intended, are capable of a defamatory and libelous meaning. Hence the assertion in one part of the complaint that they served to charge a crime, if untrue, may be disregarded as mere surplusage. The plaintiff is bound by his innuendo only when that is necessary to make apparent the defamatory character of the words used. *Carter v. Andrews,* 16 Pick. 1; *Kraus v. Sentinel Co.* 60 Wis. 425, 19 N. W. 384. It should be noted, however, that while the complaint apparently does assert that the whole article of September 22d, taken together, charges crime, a more limited innuendo is applied to the statements that plaintiff was a distributing agent and that he sent $500 of Sawyer money

to a Door county man, namely, that their meaning was to charge the purpose of "corrupting and bribing" legislative candidates. This, we think, may reasonably mean merely bribing in the colloquial sense, without necessarily importing all the technical elements of the crime of bribery; the complaint being entitled to favorable and liberal construction to support it. *Pfister v. Sentinel Co.* 108 Wis. 572, 84 N. W. 887; *Somervaill v. McDermott,* 116 Wis. 504, 507, 93 N. W. 553.

We are further of opinion that the remark at the close of the article of September 22d: "It would be interesting to know how far the money went on its return journey"—is capable of carrying the insinuation of a suspected conversion or misappropriation of it by plaintiff. The mere capability of the libelous meaning is all that the court need pass on, and all that we have meant to declare in our discussion of other parts of this publication. Whether such meaning was in 'fact conveyed to the readers is a jury question. *Bradley v. Cramer,* 59 Wis. 309, 312, 18 N. W. 268; *Robertson v. Edelstein,* 104 Wis. 440, 80 N. W. 724; *Dabold v. Chronicle Pub. Co.* 107 Wis. 357, 362, 83 N. W. 639.

We are urged to overrule *Bradley v. Cramer* and a line of following cases in holding that words merely tending to subject plaintiff to degradation, contempt, or ridicule, when published in writing, are libelous *per se* without proof or allegation of special damage. We shrink from doing so, since we find them supported by every authority, ancient or modern, within our knowledge, which treats the subject. Counsel refer us to some discussion in Newell, Libel & S. (2d ed.) 850, which he deems inconsistent with the decisions in this court; but it is not at all so when read in comprehension of the distinctions laid down by the same author. Thus he declares special damages are necessary of allegation or proof only when the published words are not actionable *per se.* Newell, Libel & S. (2d ed.) 841, 849. Written words which

subject plaintiff to disgrace or ridicule are actionable *per se.*
Id. 43. Such words, if spoken, are actionable only in case
of special damages. Id. 84. It is not necessary to prove spe-
cial damages in any case of *libel.* Id. 856.

Immaterial is the circumstance urged by some of the ap-
pellants that the charges against Mr. Sawyer are nowhere
alleged to be false. If true, that only aggravates the de-
famatory effect of a false charge against plaintiff of com-
plicity and participation.

*By the Court.*—Orders appealed from are affirmed.