FIRST NATIONAL BANK OF JEANNETTE, PENNSYLVANIA, Appellant, v. MISSOURI GLASS COMPANY, Respondent.

St. Louis Court of Appeals. Submitted on Briefs November 11, 1912. Argued and Resubmitted December 14, 1912. Opinion Filed December 31, 1912.

1. APPELLATE PRACTICE: Review: Failure of Court to Rule: Necessity of Saving Exception: Trial Practice. A party objecting to the admission of evidence has a right to insist that a ruling be made thereon, and if the court refuses to rule, he should except to such refusal, and if he fails to do so, the action or nonaction of the court is not reviewable.

2. COMBINATIONS IN RESTRAINT OF TRADE: State Statutes: Not Applicable to Interstate Commerce. Chapter 98, Revised Statutes 1909, condemning pools and trusts, and providing, *inter alia*, that the purchaser of any article from any individual, company or corporation transacting business contrary to its provisions shall not be liable for the price of such article, etc., is limited by its express terms to transactions within this State, and has no application to interstate purchases and sales.

3. INTERSTATE COMMERCE: Supremacy of Federal Laws. The laws of the United States regulative of interstate commerce are exclusive and supreme.

4. COMBINATIONS IN RESTRAINT OF TRADE: Sherman Anti-Trust Act: Jurisdiction of State Courts. State courts have jurisdiction to construe the Sherman Anti-Trust Act (26 Stat. at Large, 209, 7 Fed. Stat. Ann., p. 336) and to determine whether contracts involved in litigation before them are violative of its provisions.

5. ————: Agreement to Pay Commissions on Purchases. An agreement whereby an association of manufacturers agrees to pay retailers who purchase from members of the association a commission on such purchases, is not unlawful.

Bank v. Glass Co.

6. ———: Sherman Anti-Trust Act: Agreements not Within Act: Facts Stated. An association of glassware manufacturers, who controlled about sixty per cent of that business in the United States, contracted with retailers to allow them rebates on purchases of certain kinds of glassware from any member of the association during the year, provided they accepted and paid for all purchases from such members in conformity with the prices and terms established by such members, and provided all their purchases of certain kinds of glassware during that year were confined to such members. There were sixty or more different kinds of glassware that the retailers were not required to purchase from members of the association, and, while such members adopted minimum prices for the different goods they sold, there was no understanding or agreement by which the retailers were required to maintain a certain price in selling the goods. Held, that, as affecting interstate transactions, the contract was not violative of the Sherman Anti-Trust Act (26 Stat. at Large, 209, 7 Fed. Ann., p. 336)—the members of the association and their competitors not dealing in articles of prime necessity nor rendering public or quasi public service, and each, therefore, having the right to refuse to sell its commodities at any price, the right to fix the prices at which and the terms upon what it would sell them, and the right to determine with what persons it would make its contracts of sale; and hence it is held that a retailer who had entered into such a contract with the association could not escape liability for the purchase price of glassware bought from one of its members in another State and shipped to the retailer in this State, on the ground the contract was violative of the provisions of the Sherman Anti-Trust Act.

7. ———: Sale of Articles not affected by Combination: Right of Recovery. The fact that a seller is a member of an unlawful pool or trust does not release the buyer from its obligation to pay, where the articles bought and the transaction by which they are bought are not directly connected with such pool or trust.

8. ———: ———: ———: Interstate Transactions: Sherman Anti-Trust Act. In an action for the purchase price of glassware bought in another State and shipped to defendant in this State, defended on the theory that an agreement by an association of which plaintiff was a member, to pay defendant a rebate on certain kinds of glassware, was violative of the Sherman Anti-Trust Act (26 Stat. at Large, 209, 7 Fed. Stat. Ann., p., 336), held that the evidence failed to show that the articles sold were of the kinds embraced within the agreement, and hence it is held, that the defense would not be good, even though the agreement, as to the articles affected by it, were within the inhibition of the statute.

9. **APPELLATE PRACTICE:** Direction of Judgment for Plaintiff. Where the correctness of an account sued on and the fact that it is unpaid are admitted, and the only defense put forward is determined to be without merit by the appellate court, a judgment entered for defendant on such defense will be reversed and the cause will be remanded to the trial court with directions to enter judgment for plaintiff.

Appeal from St. Louis City Circuit Court.—*Hon. Eugene McQuillen,* Judge.

REVERSED AND REMANDED (*with directions*).

*Lee W. Grant* for appellant.

(1) The orders in question contemplated that the McKee-Jeannette Glass Works was to manufacture the glassware in Pennsylvania and ship it to St. Louis. It was interstate commerce and the Missouri statutes could have no affect upon it without infringing upon the power of Congress to regulate interstate commerce. Glass Co. v. Glass Co., 74 C. C. A. 462; International Text Book v. Pigg, 217 U. S. 91. (2) If the State statutes relied upon by defendant are intended to apply to interstate commerce, then they are unconstitutional for the same reason. (3) In order that these statutes should be effective, it is necessary that the alleged unlawful act has been performed wholly or partly within the State. Lead Co. v. Grote, 80 Mo. App. 247. (4) The McKee-Jeannette Glass Works had no office in this State, entered into no combination or contract affecting trade in this State and did no act affecting trade in this State. The operations both of the Keystone Selling Association and of the Glass Association, whether lawful or unlawful, were wholly without the State of Missouri and their acts are, therefore, not embraced within the inhibition of these statutes. State ex inf. v. Standard Oil, 218 Mo. 458. (5) The purpose of the agreement and combination was to give a discount to those who bought certain kinds

of glassware exclusively from the members of the associations. Each company had its own styles and patterns. The manufactures of the respective companies are not commodities of prime necessity, like grain or foodstuffs. There was no monopoly because at least twelve companies were able to exist outside the associations. There was no agreement to maintain prices as between the members of the associations. The Missouri Glass Company could sell to whom it pleased and at what prices it pleased. Any one could buy from the members of the associations. The agreement and the acts shown, therefore, were not in contravention of the Federal statutes. (Act of July 2, 1890, c. 647, sec. 1, commonly called the Sherman Act). Phillips v. Cement Co., 61 C. C. A. 19; Whitwell v. Tobacco Co., 60 C. C. A. 290. Several sellers of a commodity may enter into a combination and refuse to sell their goods except to those who agree to deal exclusively with them. Dueber Mfg. Co. v. Watch & Clock, 14 C. C. A. 14. The members of the associations had a right to offer a discount, on a sliding scale, to those who did actually buy certain of their goods exclusively of them and who paid their bills. See In re Corning, 51 Fed. 205, 211. A distinction has been drawn between goods sold everywhere in open market and goods manufactured by the parties themselves. Salt Co. v. Salt Co., 18 Grant's Ch. 540; Cohen v. Envelope Co., 56 N. Y. Supp. 588. (6) Even if the combination and agreement were obnoxious to the Sherman Act, advantage could not be taken of such fact by the defendant. The contract of purchase is wholly distinct from the offer set out in Exhibit 1, which is merely a collateral promise to pay discounts under certain conditions. Therefore the case does not come under the terms of the Voight case. Connolly v. Sewer Pipe Co., 184 U. S. 540. (7) A party seeking recovery cannot be defeated on account of illegal conduct, if he can make out his own case otherwise

than through the medium of an illegal transaction. Rozell v. Beckemeir, 134 Mo. 380; Frost v. Plum, 40 Conn. 111.

*Geo. W. Lubke* and *Geo. W. Lubke, Jr.,* for respondent.

(1) The account sued on was part of and directly connected with the illegal combination of the Keystone Selling Association and the Glass Association, the purpose of which associations was to restrain competition between the members, to control and maintain prices and to preclude customers from dealing with other vendors by establishing a pool made up by all the members of the respective associations and distributing the same from time to time as a commission, provided the customer confined his purchases of the specified articles from members of the respective associations. The plaintiff was a corporation under the laws of Maine, and was located in Pennsylvania, and defendant was incorporated under the laws of and located in Missouri, and the articles charged for in the account were contracted for in Missouri, according to the price list fixed by the associations, and to be shipped by plaintiff from Pennsylvania to be delivered to defendant in Missouri, which was done. These elements having all been shown by the evidence and found by the trial court, the federal statute forbade aid to plaintiff by the court. Federal Statutes, annotated, vol. 7, pp. 336, 340, 345; Wall Paper Co. v. Voight & Sons Co., 212 U. S. 227; Freight Assn. v. U. S., 166 U. S. 290; Pipe & Steel Co. v. U. S., 175 U. S. 211; U. S. v. Swift & Co., 196 U. S. 375; U. S. v. Tobacco Co., 221 U. S. 106. (2) The defense pleaded and supported by the proof also authorized the court below to render judgment for the defendant under the common law rule that the aid of the courts cannot be invoked to aid monopolies or any of their members to

collect debts made with them. State ex inf. v. Armour Packing Co., 173 Mo. 356.

STATEMENT.—This action was brought on an account for glassware sold by McKee-Jeannette Glass Works, a corporation of the State of Maine, having its principal office and manufactory at Jeannette, Pennsylvania, to defendant, a corporation of the State of Missouri. Afterwards the vendor sold and assigned the account, for value, to the First National Bank of Jeannette, a national bank located at Jeannette. Defendant failing to pay the account, action was instituted by the bank against it in the circuit court of the city of St. Louis.

The petition is in the usual form, an itemized account being attached to it as an exhibit, showing a total of $1318.17, with credits for $18.37, leaving a balance of $1299.22, for which account payment is demanded.

The answer, after a general denial, sets up in substance that defendant had made the purchase of the glass and glassware and had received it but had not paid for it in full and refused to do so and still refuses to do so, on the grounds that during all the times alleged in the petition, and in the account filed with it as an exhibit, the McKee-Jeannette Glass Works, hereafter referred to as the Glass Works, had become and was a member of a pool, trust, agreement, combination, confederation or understanding with other persons, named in the answer, to restrain the trade or competition in the manufacture, purchase or sale in this State or elsewhere of glass and glassware, which pool, trust, etc., had been entered into and was maintained during the time above mentioned by the name of the Keystone Selling Association and of the Glass Association, "contrary to law and in violation of the statutes of this State relating to pools, trusts and conspiracies, and of the laws of the United States." The

names of nine companies or corporations are given whom it is alleged composed the Keystone Selling Association, the McKee-Jeannette Glass Works being one of them, but not including defendant as one. It is further averred that the Glass Association was composed of the United States Glass Company of Pittsburg, Pennsylvania, and nineteen other glass manufactories located at various points and places in Pennsylvania, West Virginia, Ohio and Indiana, names not given, and that not including defendant. It is averred that the Selling Association, meaning by that the Keystone Selling Association, controlled the output of glassware of the manufactories above named and from time to time during the period covered by the transaction with defendant controlled the output of glassware of those divers manufactories and from time to time during that period restrained the manufacture of glassware by those parties and also restrained competition between the companies named as composing the Selling Association in the sale of glass and glassware in Missouri and elsewhere and from time to time made promises to purchasers of glass and glassware in Missouri and elsewhere, including among those persons the defendant, to pay such purchasers out of the pool formed by the trust certain commissions or rebates "to compensate these purchasers for the loss suffered by them because of the destruction or impairment by said combination of the competition in the trade in glassware; that the defendant, by reason of the conditions aforesaid, was obliged to purchase from the McKee-Jeannette Glass Works, or of other members of the Keystone Selling Association, the merchandise consisting of glass and glassware aforesaid; that the defendant was unable to purchase the same elsewhere, because of the said combinations of manufacturers and sellers of glass, and defendant also states and charges the fact to be that when defendant made the purchases aforesaid, from said McKee-Jeannette

Glass Works, the defendant was promised commissions or rebates on account thereof, in cash, from the pool so formed and maintained by said trust or combination; but the payment of these rebates or commissions has not been made; on the contrary, payment thereof is now refused." Because of the matters and facts above stated, defendant avers that it is not indebted to either the McKee-Jeannette Glass Works or to the plaintiff in any sum whatsoever. This answer was demurred to, the demurrer overruled, whereupon plaintiff filed a motion to strike out all of the answer except the part of it containing a general denial, on the ground that all of the remaining part of this answer constitutes no defense to the cause of action set out in the petition. This was also overruled.

A reply was thereupon filed.

At the close of the evidence in the case and the giving of certain declarations of law asked by defendant, refusing all asked by plaintiff, the court, sitting as a trier of fact, a jury having been waived, found in favor of defendant. Interposing a motion for new trial and saving exception on that being overruled, plaintiff perfected its appeal to the Supreme Court of this State.

That court, adopting an opinion written by Mr. Commissioner BOND, transferred the cause to this court upon the ground that it was a case within our jurisdiction and not within that of the Supreme Court. [See First National Bank of Jeannette v. Missouri Glass Co., —— Mo. ——, 147 S. W. 1030.] The cause is accordingly before us on the appeal of the plaintiff. After the cause reached our court respondent was adjudged bankrupt and its trustees entered their appearance here.

Errors assigned are to the refusal of the trial court to give any of the declarations of law asked by plaintiff; to error in giving the defendant's declarations; to error in not sustaining plaintiff's objection

to the introduction of any evidence by defendant under the affirmative defense set up in the answer; to error of the court in admitting in evidence contracts between the defendant and the Keystone Selling Association and between the defendant and the Glass Association; to error of the court in failing to pass upon plaintiff's objections to sundry questions, and in failing to sustain plaintiff's objections to the same questions.

Disposing of this last assignment, it is sufficient to say that if plaintiff desired a ruling at the time on the objections it made to the admission of testimony, it was within its right to insist on a ruling; if the court then failed to rule, plaintiff could have excepted to this failure. As it neglected to do this, the action of the court or its non-action on the objections is not before us.

In the view we take of this case we do not think it necessary to pass upon the assigned error of the trial court in not sustaining plaintiff's objection to the introduction of any evidence under the affirmative defense set up in the answer, nor do we consider it necessary to take up the assignments of error in detail, save as above.

The contracts between defendant and the Keystone Selling Association and the Glass Association are identical. The membership of the two bodies is as set out in the answer. The McKee-Jeannette Glass Works was a member of the Keystone Selling Association but not of the Glass Association. The defendant was not a member of either, but a buyer from the McKee-Jeannette concern, possibly from others, but as to the account in suit, directly from the McKee-Jeannette Glass Works. The members of the Selling and Glass Associations, as far as we can gather from the testimony, were manufacturers of glass and glassware. While it appears that the membership at the time of this transaction was as set out in the answer, it also

appears that the membership varied, some of those in
it dropping out from time to time and new members
joining. It is not very clear what the objects of either
of these associations were. The nearest approach to
any testimony on that is this: A witness, who had
been for a little over a year secretary and treasurer
of the Keystone Selling Association, was asked what
business was conducted by that association. He an-
swered that he thought it was for the purpose of main-
taining prices among the members. This answer was
objected to as calling for a conclusion and counsel for
appellant moved that it be stricken out. No ruling was
made on the objection or the motion. But on this wit-
ness being asked how this was accomplished, he an-
swered that it was by an agreement among the mem-
bers, which he identified and which is in evidence. That
agreement is headed as follows:

"Glass Association,

    1510 and 1511 Park Building,

        Pittsburg, Pa.

"This is a Contract, Read it Carefully and File
for Reference.

        "Pittsburg, Pa., January 1, 1907."

It is addressed to the Missouri Glass Company at
St. Louis and, omitting immaterial matters, is as fol-
lows, the words in parenthesis ( ) being so placed in
the original:

"Dear Sir:

"This is to advise you that Glass Association and
Keystone Selling Association will pay, on certain con-
ditions (designated below), a commission in cash on
purchases of glassware, crystal and colored (not in-
cluding packages), from the members of these asso-
ciations, the nature of the agreement being as fol-
lows:

"The basis of commission to be paid will be fixed
by your total purchases during the year 1907, from
any or all of the members of both associations. Each

association to pay the commision on the purchases from its own members, but in no case will either association pay, or hold itself liable to pay, the commission on purchases from members of the other.''

An illustration of how this works is then given. Following that the agreement proceeds:

"Commission Schedule.

"On all purchases of glassware (subject to commission) made from members of this association, and paid for in accordance with its established prices and terms, contracted for after this date and shipped during the year, 1907, a commission in cash will be paid February 1, 1908, or as soon thereafter as the accounts can be adjusted, subject to conditions named below. The rate of commission to be fixed by your total purchases from any or all of the members of Glass Association and Keystone Selling Association on ware subject to commission, as follows, but no consolidation of accounts of two or more dealers for the purpose of increasing commission rate will be permitted.''

Then follows a table showing rate of commissions on purchases. Thus, on purchases of $1000, a commission of two per cent was allowed, and on $21,000, a commission of six and seven-tenths per cent, and for each additional $1000, one-tenth of one per cent up to a total purchase of $54,000 was to be added, when the commission was to be ten per cent, which is the maximum commission offered. The contract then proceeds as follows:

"The conditions are as follows:

"Condition One: That you shall have accepted and paid for all your purchases made from members of the Glass Association and the Keystone Selling Association in conformity with their established prices and terms.

"Condition Two: That purchases or receipts of Domestic Crystal and Colored Glassware during the

year 1907 (except as noted in paragraph marked 'Ware not subject to commission'), must be confined to the members of Glass Association and the Keystone Selling Association, otherwise, no commission will be paid.

"Condition Three: That you shall not have consolidated your account with that of any other dealer in order to increase your commission rate.

"Condition Four: No commission will be paid to firms or individuals who now or may during the year 1907 represent any glass manufacturer on a commission, or act as sales agent either directly or indirectly.

"Condition Five: The violation of, or the noncompliance with, any condition in this contract or agreement, by you or any one in your employ, will, without notice to you, release the Keystone Selling Association from all liability to pay the commission offered.

"Condition Six: That the right of Keystone Selling Association to revoke and cancel this proposition, or any part thereof, at any time, is reserved, but that obligations accrued hereunder up to date of said revocation shall be paid. Class 1 Ware, nonpremium."

There is no testimony as to what "Class 1 Ware" consists of, nor any explanation of this term "nonpremium." Then follows this heading: "Ware not subject to commission," under which is this: "The purchasing of the following from any one not a member of Glass Association or Keystone Selling Association shall in no way interfere with the commission being paid as herein provided for." Here follows a list of over sixty articles of glass and glassware. Following the list is this: "This proposition will not become binding on the Keystone Selling Association unless this letter and a similar one of even date, sent out by Glass Association, are accepted over your signature on blank forms attached to these letters, by February

169 Mo. App.—25

1, 1907.'' Following the signature of the treasurer of the Keystone Selling Association is this: ''Please detach, sign and return below acceptance slip if you wish to co-operate.''

A paper exactly similar in all respects to the foregoing, save that it was in the name of the Glass Association, was also sent to defendant by the Glass Association.

There was testimony that the defendant company had signed, detached and returned acceptance slips, one to the Glass Association, one to the Keystone Selling Association. Apparently this was done within the time specified, that is, by February 1, 1907, in which year all of these purchases were made. It further appears that on the 12th of August, 1907, the Glass Association and Keystone Selling Association mailed to the defendant company from Pittsburg, a letter or circular in which it is stated that those associations begged to call the attention of the defendant to condition two (2) of the defendant's commission agreement. Condition two, as herein above set out, is copied into this letter, which purported to be signed by the two associations. As stated, the purchases involved in this action were made during the year 1907. They were made either through an agent of the Glass Works at St. Louis and the orders transmitted by him to Pittsburg to the Glass Works, or were made by letter from St. Louis and mailed to the Glass Works at Pittsburg, the goods being shipped from Pittsburg by the Glass Works to St. Louis and there delivered to defendant. It was in evidence that the members of these two associations, the Keystone and the Glass, comprised something above sixty per cent of the glass manufacturers of the United States and that the members of these two associations had their own patterns and styles of glassware which they manufactured. While it is in evidence that the members of the Selling and Glass Associations, as between themselves,

adopted uniform minimum prices on the different lines of goods, at which they were to be sold to their customers, there was no evidence of any contract, understanding or agreement restricting sales by purchasers, or by which defendant or any one else, purchasing from any of the members of these associations, was required to maintain any prices when selling the goods which they purchased from or through the Selling or Glass Associations, or from any of the members of those associations. The purchases made by defendant from plaintiff's assignor, the McKee-Jeannette Glass Works, were made in the ordinary course of business and were made, so far as the evidence shows, on what may be called parol contracts. When the defendant company desired to purchase any of the glassware made or handled by the McKee-Jeannette Glass Works it either gave the order to the resident agent of that concern at St. Louis or sent them on direct to the concern at its office at Pittsburg. Whether any reference whatever was made in the orders for goods or in connection with the purchases, to these contracts, does not appear.

REYNOLDS, P. J. (after stating the facts).— From the evidence in this case it is clear that our Missouri statutes condemning pools and trusts, now chapter 98, Revised Statutes 1909, and which in section 10,307 provides, that "any purchaser of any article or commodity from any individaul, company or corporation transacting business contrary to any provision of the preceding sections of this article shall not be liable for the price or payment of such article or commodity, and may plead this article as a defense to any suit for such price or payment," does not apply to this transaction; for that article, by the first section of it, section 10,298, Revised Statutes 1909, limits its application to transactions "in this State." That it relates solely to transactions in this State has been de-

cided by our court in the case of National Lead Co. v. Grote Paint Store Co., 80 Mo. App. 247, where at page 272 it is said: "All that the statute requires to be shown to afford such a release (from obligation to pay the debt), in addition to the proof of the illegal character and purpose of the plaintiff corporation already referred to, is evidence that the indebtedness sued for grew out of the transaction of its business in the State." That decision has never been departed from, nor its correctness challenged. The same rule is recognized in the Federal court of this jurisdiction in the case of Hadley-Dean Plate Glass Co. v. Highland Glass Co., 74 C. C. A. 462, l. c. 464, where it is further said: "The contract was for the sale of glass to be manufactured by the vendor in Pennsylvania and delivered to the vendee in Missouri, and therefore directly related to interstate commerce." In State ex. inf. Attorney General v. Standard Oil Co., 218 Mo. 1, l. c. 458, 116 S. W. 902, it is held that in order to bring into operation our laws against pools and trusts the transaction must be carried on in this State. Judge Woodson, in his opinion, which, so far as this point is concerned, appears to have been concurred in by all the court, makes this very forceful illustration (l. c. 459): "It goes without saying that if the contract or conspiracy is entered into and formed in another State, or foreign country, then the parties thereto could not be punished under the laws of this State for entering into and forming the conspiracy, any more than a man could be punished here for stealing a horse in another State; but if he should bring the stolen horse into this State, then he could be punished for the latter act under the laws of this State, for the obvious reason that the illegal act committed in the foreign State would follow the man and horse into this State, which would enter into and form an illegal element in his possession of the horse, and thereby subject himself to the penalties of our law. The same is true with

reference to commodities sold in violation of our anti-trust laws. It is wholly immaterial where the unlawful conspiracy was entered into, or the means by which it was formed, if, as a matter of fact, the commodities are sold in this State in pursuance to such conspiracy—then the vendors are violators of our law and are punishable as such." And at page 463, Judge Woodson, summing up the conclusions of the court as to the acts of usurpation by the Standard Oil Company and its acts in violation of our statute concerning pools and trusts, has specifically set out that the acts of selling were done in this State; that by the conspiracy entered into the defendant corporation there had sought to limit and control trade in this State, to prevent competition in this State, and the conclusion was that the respondent in that case, by means of the pool, trust and combination, etc., had fixed, controlled and maintained prices to dealers in this State; had controlled and limited the trade of refined products of petroleum in this State, had controlled, limited and prevented competition in this State.

As there is no evidence in the case before us that the purchases and sales under consideration were made other than in Pennsylvania and that the transaction is one involving interstate commerce, a subject over the regulation whereof the laws of the United States, Congress having acted, are exclusive and supreme, the question for our determination here is whether this transaction, pertaining as it does to interstate commerce, was unlawful under what is known as the Sherman Anti-Trust Act. (26 S. at L. 209, 7 Fed. Stat. Ann., p. 336.]

Preliminary to the consideration of this, we are met with the question as to whether, conceding that these contracts and this transaction involved violated the Sherman Act or Law, we have jurisdiction to apply it here as to these contracts, the law violated not being that of the State of Missouri but of the United

States. As that question was not discussed or touched upon in any manner in the briefs of counsel, we directed that it be briefed and argued orally, not only in this case, but also in Westmoreland Specialty Co. v. Missouri Glass Co., 169 Mo. App. 368, 152 S. W. 387, in which it was claimed that the same question arose. We have decided that case along with this, as will be seen by reference to the report of it, and refer to it to be read with this case and as covering some points not here discussed. Pursuant to that direction of the court, counsel for the appellant here and counsel for the appellant in Westmoreland Specialty Co. v. Missouri Glass Co., as well as counsel for the trustees in bankruptcy, have not only argued this matter orally but submitted briefs on that question.

Counsel for the Westmoreland Company argues in support of the contention that the enforcement of the rights created by the congressional act was intended to be restricted to the federal courts; that the Sherman Act contains nothing suggestive of a concurrent jurisdiction in the State courts; that the act itself not only impliedly but expressly restricts the enforcement of the rights which it creates to the federal courts, referring to sections 4 and 7 of the act. In support of this Carlisle v. Missouri Pacific Ry. Co., 168 Mo. 652, l. c. 656, 68 S. W. 898, is cited. There it is said that when an act creates a new liability or gives a right of action and at the same time prescribes the means by which, or the court in which, the right is to be enforced, resort cannot be had to any other means or court than that prescribed. This, it is claimed, was approved in Wabash Railroad Co. v. Sloop, 200 Mo. 198, l. c. 218, 98 S. W. 607; in Copp v. Louisville & Nashville R. Co., 43 Lou. Ann. 511; in Voorhies v. Frisbie, 25 Mich. 476, and Missouri River Telegraph Co. v. First National Bank of Sioux City, 74 Ill. 217. State ex rel. v. Associated Press, 159 Mo. 410, l. c. 466, 60 S. W. 91, is also relied upon. There at page

466 our Supreme Court said: "There is one remaining point to be considered and that relates to the anti-trust laws. So far as concerns those of Illinois they are not of force in this State, and as to those of the United States, they must be enforced in another form." Newell v. National Bank of Somerset, 12 Bush (Ky.), 57, is cited as being to the same effect.

Opposing this view, counsel for the receivers in bankruptcy, now respondent, urging his contention that the courts of this State have jurisdiction to construe the Sherman Anti-trust Act and to determine whether or not the contracts here, which are identical with those in the Westmoreland Specialty Company case, were essential parts of a combination and scheme in violation of the Sherman Act, further contends that in construing that act, this court is bound to follow decisions upon it by the Supreme Court of the United States. Citing the sixth article of the Constitution of the United States, which ordains that that Constitution and the laws of the United States made in pursuance thereof are the supreme law of the land and that the judges in every State shall be bound thereby, that counsel concedes that in the absence of a federal statute clothing the State courts with such jurisdiction so to act, that the State court neither can nor should enforce a penal law of the United States as such, and that in so far as the Sherman Act by its terms provides for affirmative relief on the part of individuals and provides that such relief should be obtained by actions brought in the federal courts alone, it may be conceded that the courts of the State would have no jurisdiction to grant such affirmative relief, referring for this to Mondou v. New York, New Haven & Hartford R. R. Co., 223 U. S. 1. Counsel contends, however, that in the case at bar respondent is not seeking to enforce any right or affirmative relief granted to it by the Sherman Act, nor is it seeking to recover a penalty under that act; to the contrary the conten-

tion is that the alleged cause of action of plaintiffs in both of these cases arises out of a violation of the national law and therefore will not be enforced by the courts of any State; that our courts would not give countenance to an action arising out of the violation of the laws of even a foreign country. This case, it is contended, is governed by the fundamental maxim, *ex dolo malo non oritur actio.* Hence that counsel submits that it is immaterial whether this act is wrongful by the statutes of the State of Missouri or of those of the United States or of a sister State, or even of a foreign country, or is contrary to general public policy; in either case, our courts will not enforce it. If, then, it be conceded that the right of action arises out of a wrongful act, he contends, the courts of this State will not enforce it. Graves v. Johnson, 156 Mass. 211, is cited in support of this. Robinson v. Levy, 217 Mo. 498, 1. c. 513-514, 117 S. W. 577, is cited and quoted from to the effect that jurisdiction may be defined as the right to adjudicate the subject-matter in a given case.

Counsel further claims that our Supreme Court having held in the case now before us (—— Mo. ——, 147 S. W. 1031) that this court has jurisdiction to pass on this appeal, it necessarily follows that we have the right to pass on the issue raised in the pleadings, namely, that the cause of action is founded on an agreement that is illegal because in violation of the Sherman Anti-trust Act, and is conclusive as to our jurisdiction.

It is finally argued by that counsel that under the construction of the Sherman Act by the Supreme Court of the United States, the cause of action of the plaintiffs in these cases arises out of, and is an essential part of, a combination and agreement in violation of that act, and that the courts of this State will grant no relief to a plaintiff whose cause of action is based on a violation of that law of the United States.

We see no reason to differ from the reasoning advanced and conclusion arrived at by the learned counsel for the trustees in bankruptcy, now representing the respondent here, as to the jurisdiction of this court to determine this case and to determine it on a construction of an act of Congress, popularly known as the Sherman Anti-trust Act or Law. We do not, however, agree that the contracts in evidence and the transaction here involved are in violation of that act, as that act has been construed by the Supreme Court of the United States. We think that this is determined by a consideration of the decisions of the Supreme Court of the United States, as well as of those of inferior federal courts whose decisions are necessarily bottomed on those of the Supreme Court and may generally be looked to for correct application of the decisions of the Supreme Court.

Referring to Mondou v. New, York, New Haven & Hartford R. R. Co., supra, generally referred to as the "Second Employers' Liability Cases" (Act of Congress, April 22, 1908, 35 S. at L. 65, c. 149, as amended by Act of April 5, 1910, 36 S. at L. 291, c. 143), it is to be noted that the Sherman Anti-trust Act does not in terms vest concurrent jurisdiction for its enforcement in the State courts, as does the Employers' Liability Act. This provision in the Employers' Liability Act, placed there by the amendatory act of April 5, 1910, is dwelt upon by Mr. Justice Van Deventer in Mondou v. New York, New Haven & Hartford R. R. Co., supra (l. c. 56), as very persuasive in not only conferring, but enforcing, jurisdiction upon the State courts, contrary to the adverse holding on that point by the Supreme Court of Errors of Connecticut. It is true, however, that Mr. Justice Van Deventer on the same page seems to hold that even without such provision in the Employers' Liability Act, and by parity of reasoning, even for lack of it in the Sherman Act, the jurisdiction of national and

State courts was concurrent in all suits of a civil nature—within an amount named, "and arising under the Constitution or laws of the United States," referring to the Act of Congress of August 13, 1888, 25 S. at L. 433, c. 866, sec. 1, which the learned justice says is only emphasized by the amendment of 1910 to the Employers' Liability Act.

A very instructive opinion concerning some of the points involved in the case before us is Connolly v. Union Sewer Pipe Co., 184 U. S. 540, the opinion delivered by Mr. Justice HARLAN, concurred in by all the members of the court sitting, save Mr. Justice McKENNA, whose dissent was on grounds other than relating to the reference we here make to it. In that case it was held (l. c. 545) that even assuming that a combination is illegal if tested by the principles of the common law, "still it would not follow that they (defendants) could, at common law, refuse to pay for pipe bought by them under special contracts with the plaintiff. The illegality of such combination did not prevent the plaintiff corporation from selling pipe that it obtained from its constituent companies or either of them. It could pass a title by a sale to any one desiring to buy, and the buyer could not justify a refusal to pay for what he bought and received by proving that the seller had previously, in the prosecution of its business, entered into an illegal combination with others in reference generally to the sale of Akron pipe." Mr. Justice HARLAN quotes approvingly from Dennehy v. McNulta, 86 Fed. Rep. 825, l. c. 827, that "the mere fact that the corporation, as one of the contracting parties, may constitute an unjust monopoly, and that its general business is illegal . . . cannot serve, *ipso facto*, to create default or liability on its contracts generally; nor can such fact be invoked collaterally to affect in any manner its independent contract obligations or rights. . . . In the case of an injurious combination of the nature asserted here, the

remedy is by well-recognized and direct proceedings; but one who voluntarily and knowingly deals with the parties so combined cannot, on the one hand, take the benefit of his bargain, and, on the other, have a right of action against the seller for the money paid, or any part of it, either upon the ground that the combination was illegal, or that its prices were unreasonable.'' Following this Mr. Justice HARLAN says (l. c. 548) that it is undoubtedly the general rule that a contract made in violation of a statute is void and no recovery can be had upon it, because an act done in disobedience of the law creates no right of action which a court of justice will enforce.

Announcing these as sound principles, Mr. Justice HARLAN says, at page 549, that the action before the court was not an action to enforce or which involves enforcement of the alleged agreement or combination between the plaintiff corporation and other corporations in relation to the sale of pipe; that the plaintiff, even if part of a combination, illegal at common law, was not for that reason forbidden to sell property it acquired or held for sale. To effect that it would be necessary that the purchaser had necessary and direct connection with the illegal combination; for the contracts between the defendants and the plaintiff could have been proven without any reference to the arrangement whereby the latter became an illegal combination.

We refer to this part of the opinion because it is strenuously urged by counsel for both this appellant and for the Westmoreland Specialty Company that the purchases here involved were wholly distinct from the contract, which latter, it is contended, is merely a collateral promise to pay discounts under certain conditions. We will notice this later.

Disposing of the proposition then in the Connolly case, that the transaction involved was not void and did not prevent a recovery by plaintiff on the princi-

ples of the common law, Mr. Justice HARLAN, commencing at page 550, enters upon the discussion and consideration of the question as to whether the contract between the plaintiff corporation and other corporations in combination was illegal under the Sherman Act. If it was, says Mr. Justice HARLAN, "then all those, whether persons, corporations or associations, directly connected therewith, became subject to the penalties prescribed by Congress. But the act does not declare illegal or void any sale made by such combination, or by its agents, of property it acquired or which came into its possession for the purpose of being sold—such property not being at the time in the course of transportation from one State to another or to a foreign country. The buyer could not refuse to comply with his contract of purchase upon the ground that the seller was an illegal combination which might be restrained or suppressed in the mode prescribed by the act of Congress; for Congress did not declare that a combination illegally formed under the Act of 1890 should not, in the conduct of its business, become the owner of property which it might sell to whomsoever wished to buy it."

In Continental Wall Paper Co. v. Voight & Sons Co., 212 U. S. 227, commonly known as the "Wall Paper Trust Case," the doctrine announced in the Connolly case is reaffirmed but held not to apply to the transaction there involved. While the members of the Supreme Court divided on the application of the Connolly case on its facts to the Wall Paper case, there was no dissent on any of the propositions here involved. The general principles there announced are recognized as correct by all the members of the court, even by those who dissented in the Wall Paper Trust case. Mr. Justice HOLMES, who delivered the opinion for the minority, cited approvingly not only the Connolly case but that of Chattanooga Foundry & Pipe Works v. Atlanta, 203 U. S. 390, l. c. 397, as deciding

that the purchaser cannot escape payment "merely on the ground that the seller is an unlawful trust." That justice further says in the Wall Paper case (l. c. 270), that even assuming that the defendant in that case may be taken to have made the purchase in question with knowledge that the seller, plaintiff there, was part of an illegal combination and had made the sale with knowledge of the intent to carry that out, "it cannot be contended that, therefore, it was a party to a transaction illegal for that reason.  Whenever a party knows that he is buying from an illegal trust, and still more, when he buys at a price that he thinks unreasonable but is compelled to pay in order to get the goods he needs, he knows that he is doing an act in furtherance of the unlawful purpose of the trust, which always is to get the most it can for its wares. But that knowledge makes no difference, because the policy of not furthering the purposes of the trust is less important than the policy of preventing other people from getting other people's property for nothing when they purport to be buying it."  We do not understand that this is contrary to the reasoning underlying the decision in the Connolly case, nor has our attention been called to any decisions to the contrary —certainly nothing in the opinion of the court in the Wall Paper case controverts it.

In Whitwell v. Continental Tobacco Co.; 60 C. C. A. 290, 125 Fed. Rep. 454, a decision by the circuit court of appeals of this circuit, it is held that an arrangement or agreement to lessen competition is not within the prohibition or meaning of the Sherman Act.  In that case Judge SANBORN, concurred in by Judges THAYER and VAN DEVENTER, says (l. c. 295, 60 C. C. A.; l. c. 459, 125 Fed. Rep.) : "The right of each competitior to fix the prices of the commodities which he offers for sale, and to dictate the terms upon which he will dispose of them, is indispensible to the very existence of competition.  Strike down or stipulate

away that right, and competition is not only restricted, but destroyed. . . . The contract, combination, or conspiracy charged against them did not restrict competition between them and the independent manufacturers or dealers who, according to the complaint, were their competitors, because it left the latter free to select their purchasers and to fix the prices of their goods and the terms at which they would dispose of them to all intending purchasers. The tobacco company and its competitors were not dealing in articles of prime necessity, like corn and coal, nor were they rendering public or quasi public service, like railroad and gas corporations. Each of them, therefore, had the right to refuse to sell its commodities at any price. Each had the right to fix the prices at which it would dispose of them, and the terms upon which it would contract to sell them. Each of them had the right to determine with what persons it would make its contracts of sale. . . . There is nothing in the Sherman Anti-trust Law which deprived any of these competitors of these rights. If there had been, the law itself would have destroyed competition more effectually than any contracts or combinations of persons or of corporations could possibly have stifled it. The exercise of these undoubted rights is essential to the very existence of free competition, and so long as their exercise by any person or corporation in no way deprives competitors of the same rights, or restricts them in the use of these rights, it is difficult to perceive how their exercise can constitute any restriction upon competition or any restraint upon interstate trade. The acts of the defendant which are alleged by the complaint in this action to constitute an unlawful restraint upon interstate commerce are nothing more than the lawful exercise of these unquestioned rights which are indispensable to the existence of competition or to the conduct of trade. The tobacco company . . . fixed the prices of its commodities so

high that the plaintiff could not profitably buy them. This was no restriction upon free competition, because it left the rivals of the company free to sell their competing commodities at any price which they elected to charge for them. . . . The tobacco company . . . sold its products to customers who refrained from dealing in the goods of its competitors at prices which rendered their purchases profitable. But there was no restriction upon competition here, because this act left the rivals of the tobacco company free to sell their competing commodities to all other purchasers than those who bought of the defendants, and free to compete for sales to the customers of the tobacco company by offering to them goods at lower prices or on better terms than they secured from that company. The tobacco company and its employees were not required, like competitors engaged in public or quasi public service, to sell to all applicants who sought to buy, or to sell to all intending purchasers at the same prices. They had the right to select their customers, to sell and to refuse to sell to whomsoever they chose, and to fix different prices for sales of the same commodities to different persons. In the exercise of this right they selected those persons who would refrain from handling the goods of their competitors as their customers, by selling their products to them at lower prices than they offered them to others. There was nothing in this selection, or in the means employed to effect it, that was either illegal or immoral.''

Without quoting further from that opinion, we refer to it, not only as to be found in the federal reports but to the extract from it, which includes all that we have quoted, set out by Judge WOODSON in State ex inf. Attorney General v. Standard Oil Co., supra, l. c. 407, et seq. There Judge WOODSON quoting at great length from it, refers approvingly to it as correctly stating the law, although applied to a case in which a manufacturing corporation ''restricted the

sales of its products to those who refrained from dealing in the commodities of its competitors by fixing the prices of its goods to those who did not thus refrain so high that their purchase was unprofitable, while it reduced the prices to those who declined to deal in the wares of its competitors so that the purchase of the goods was profitable to them."

In line with the decision in the Whitwell case is that of Phillips v. Iola Portland Cement Co., 125 Fed. Rep. 593, 61 C. C. A. 19, a decision by the same court, also cited and quoted from in State ex inf. Attorney General v. Standard Oil Co., supra (l. c. 405). There Judge SANBORN says (l. c. 594, 125 Fed. Rep.; l. c. 20, 61 C. C. A.): "It is now settled by repeated decisions of the Supreme Court that the test of the validity of a contract, combination, or conspiracy challenged under the anti-trust law is the direct effect of such a contract or combination upon competition in commerce among the States. If its necessary effect is to stifle competition, or to directly and substantially restrict it, it is void. But if it promotes, or only incidentally or indirectly restricts, competition in commerce among the States, while its main purpose and chief effect are to foster the trade and enhance the business of those who make it, it does not constitute a restraint of interstate commerce within the meaning of that law, and is not obnoxious to its provisions. This act of Congress must have a reasonable construction. It was not its purpose to prohibit or to render illegal the ordinary contracts or combinations of manufacturers, merchants, and traders, or the usual devices to which they resort to promote the success of their business, to enhance their trade, and to make their occupations gainful, so long as those combinations and devices do not necessarily have a direct and substantial effect to restrict competition in commerce among the States." Following this the opinion is in line with that in the Whitwell case, supra. We refer to this Phillips case

with full confidence that the exposition of the Sherman Law there made is correct, for it appears that the plaintiff in error there petitioned the Supreme Court of the United States for a writ of *certiorari,* which that court denied. [See 192 U. S. 606, Case No. 539.] We have quoted fully from these two cases both by reason of the high standing of the judges deciding them and by reason of the fact that they have been accepted by our own Supreme Court as correct expositions of the Sherman Anti-trust Law. We think that the principle applied in them is recognized by the Supreme Court of the United States in Standard Oil Co. v. United States, 221 U. S. 1, l. c. 63 to 70, and United States v. American Tobacco Co., 221 U. S. 106, l. c. 175 to 180.

Applying the principles announced in these several decisions to the evidence in the case and to the contract before us, we are unable to see that it violates the Sherman Anti-trust Law. Referring to that contract, it will be noticed that the first clause of it provides that the "Glass Association" and "Keystone Selling Association" will pay, on certain conditions designated in the contract itself, a commission in cash on purchases of certain lines of glassware, crystal and colored, from the members of these associations. The basis for payment of the commission is then set out. It is impossible to say that this clause is in violation of any law, common or statutory. It is no more than a provision that the associated companies, so to designate them, will pay a certain commission on all purchases made by the defendant from any of its members. There is nothing unlawful in that. Then follow the conditions upon which this commission is to be paid. They are four in number: First, that the defendant shall have accepted and paid for all its purchases from members of the two associations in conformity with its established prices and terms. In

169 Mo. App.—26

other words, the purchaser must be of good credit. We see no objection to this. Second, that the purchases or receipts "of domestic, crystal and colored glassware," during the year 1907, are to be confined to the members of the two associations, otherwise no commissions are to be paid. That this is not in violation of the Sherman Law is the distinct holding of the Circuit Court of Appeals of this circuit in the Whitwell case, supra, and is in that part of it quoted approvingly by our Supreme Court in the Standard Oil case, supra. So it is held in the Phillips case, supra. Over and above this, it is to be noted that this restriction as to purchasing is confined to "domestic, crystal and glassware," excepting from the contract, as before stated, sixty or more different kinds of glassware, as to which excepted list the defendant was at liberty to purchase from anyone.

It is further to be observed, as said in the Whitwell case, supra, referring to tobacco, that domestic, crystal and colored glassware are "not articles of prime necessity." Paraphrasing what is said in the Whitwell case by the substitution for "tobacco company" the Glass Association and Selling Association and changing from the singular to plural, these associations "and their competitiors were not dealing in articles of prime necessity, like corn and coal, nor were they rendering public or quasi public service, like railroad and gas corporations. Each of them, therefore, had the right to refuse to sell its commodities at any price. Each had the right to fix the prices at which it would dispose of them, and the terms upon which it would contract to sell them. Each of them had the right to determine with what persons it would make its contracts of sale." We may here assume that there are competitors of the members of these associations, for so is the testimony, it also appearing that the corporations composing the Keystone and the Glass Association by no means include all the manu-

facturers and dealers in this line of goods, nor, for that matter, were those associations always made up of the same concerns; some dropped out from time to time, others coming in, and when these changes in membership occurred, the defendant was sent a list of the then present members.   As we read the testimony, even when the membership of these associations was largest, it did not comprise to exceed sixty per cent of all the manufacturers engaged in that line.   Undoubtedly, therefore, these asaociations had to fix their scale of prices to purchasers from members of the associations at such terms and figures as would meet, not stifle, competition.

Furthermore, as noted, there is a long list of glass and glassware, over sixty different classes, the classes again subdivided, that are outside of, and not subject to, the terms of this agreement.   That is, as to all these sixty or more classes of glassware, the defendant and all others in like situation, could purchase any of them from anyone.

Nor is there a line of testimony in this case even tending to prove that the purchases "were of domestic, crystal and colored glassware."   These are the particular classes of goods distinctly covered by the agreement and the only ones.   There is nothing whatever to show that the articles purchased by this defendant were not of the excepted line comprised within the designation "ware not subject to commission."   All the information that we have as to the character of these purchases by defendant is the price at which the goods were bought, and that is contained in the exhibit attached to the plaintiff's petition in the case. That was in evidence.   Examining it we find that on dates commencing June 6, 1907, and ending October 9, 1907, outside of the charges for the prepayment of freight by the plaintiff company, paid by plaintiff's assignor and charged against the defendant, the items are "glassware."   So they are designated, noth-

ing else. What kind of glassware, more particularly that they "were of domestic, crystal or colored glassware," or "Class 1 Ware, nonpremium," sales on which alone are the basis for a commission and the sole subject of the contracts, is in no manner shown, either in the account or by any testimony in the case. We might dispose of the whole case on this one proposition, that even conceding that this was an unlawful contract, so far as concerns "domestic, crystal and colored glassware," which are the only class of glassware covered by it, the evidence fails to show that the "glassware" purchased and sold and for which this action is brought was either "domestic," "crystal" or "colored" glassware, or "Class 1 Ware, nonpremium." If it is true that these sales were of glassware on the sales of which no commission was payable, then this case falls directly within the decision in the Connolly case, supra, where as seen it is distinctly held that the fact that the seller is a member of an unlawful pool or trust, in no manner releases the buyer from his obligation to pay, where the articles bought, the transaction by which they are bought, are not directly connected with that unlawful trust. Briefly, you must pay for what you buy, even if the seller is a thief, so long as the article you buy was not stolen.

These four are all the conditions of this agreement. The only other clause in the contract is that the agreement is not to be binding on any of the parties unless accepted in writing by the defendant in the attached form "by February 1, 1907." In the cautionary letter, as it might be called, of date August 12, 1907, sent out by the two associations to the defendant, its attention is called to "Condition Two," which, as before stated, confines the purchases of domestic crystal and colored glassware during the year 1907 to members of the Glass Association and Keystone Selling Association; repeating here, there were excepted from this contract and its conditions over

sixty different kinds of glassware as not subject to commission and entirely outside of this agreement.

On application of the decisions of our own Supreme Court and those of the United States Courts, Supreme and Circuit, to this contract, we are unable to agree with the learned trial court that it is in violation of the act of Congress known as the Sherman Anti-trust Law.

The correctness of the account and that it is unpaid is specifically admitted. That being so, and holding that the defense set up by the respondent is unavailable, there is nothing to prevent judgment for plaintiff. [See State ex inf. Attorney General v. Delmar Jockey Club, 200 Mo. 34, 1. c. 65, 98 S. W. 539.]

The judgment of the circuit court, heretofore rendered in this cause, is accordingly reversed and the cause remanded with directions to that court to enter up judgment for plaintiff for the amount of the account with interest from the date of the commencement of the action. *Nortoni* and *Caulfield, JJ.,* concur.