DOWNER, Appellant, vs. TUBBS and another, Respondents.

*January 11—January 28, 1913.*

*Libel: Pleading: Liberal construction: Sufficiency of complaint: Charge of official misconduct: Application to plaintiff.*

1. Generally, even on a motion to make a pleading more definite and certain, certainty to a common intent is all that is necessary.

2. On a challenge for insufficiency, every reasonable intendment is to be made in favor of a pleading and all facts deemed to be pleaded which are set forth expressly or suggested by fair inference from the particular and general statements; and the pleading should be held good for any judicial relief shown to be merited, whether within the prayer for relief or the particular intent of the pleader.

3. In an action for libel the pleadings must be tested by the liberal rules applicable to pleadings in general.

4. Sec. 2677, Stats., expressly dispenses in its letter with the necessity for any statement, in a complaint for libel, of extrinsic facts to show application of the libelous publication to the plaintiff, and it is only where the language is so ambiguous as not, of itself, to reasonably point to the plaintiff, that such statement is required.

5. A complaint alleging in substance that for twenty years plaintiff had been superintendent of a county asylum and had enjoyed public confidence; that large sums of money had been expended under his supervision, part of which were customarily accounted for and reported by him under the head of "permanent improvements," and the reports printed for information of the public; and that the defendants, knowing these facts, published of and concerning the plaintiff that he had carried on "war at the expense of the county" against one of said defendants, that "money had flowed freely" to accomplish the latter's defeat at the polls, that it was believed the money came from A. (the county seat) and was "charged up to permanent improvements, as the management thought it would be a permanent improvement to eliminate" said defendant "from the county board and further meddling with asylum records,"—and also characterizing plaintiff as "the great Diana" of O. county, and referring readers to Acts, ch. XIX, which, the article stated, "tells the old story,"—is *held* to state a cause of action for libel.

TIMLIN and KERWIN, JJ., dissent.

APPEAL from an order of the municipal court of Outagamie county: THOMAS H. RYAN, Judge.    *Reversed.*

Action for damages for libeling plaintiff.

The complaint, in substance, is as follows: For a long time prior to the publication hereafter mentioned, plaintiff had been superintendent of the asylum for chronic insane in Outagamie county, Wisconsin, under supervision of a board of trustees and direction of the county board.   As such superintendent he was accustomed to expend public money for permanent improvements and to uniformly report and keep account thereof under the head of "Permanent improvements." Knowing the facts, November 15, 1909, *Peter Tubbs* maliciously composed and caused to be published in the Fox River Journal, at Appleton, in said county, of and concerning plaintiff, defendant *Westphal*—owner of such journal— with knowledge of the facts, participating, this:

"Seymour, Wis., Nov. 15, 1909.

"But years after, when we were trying to do good service for Outagamie county and rebuked the Crescent for its exaggeration in holding up our insane asylum as a money maker, we showed the public that the treasurer's books did not sustain the claims, and said we should not look to such institution for money making.   But my, we excited the management [meaning this plaintiff], and war was declared and carried on at the expense of the county [meaning that the plaintiff at the expense of Outagamie county in unlawful opposition to said defendant], and money flowed freely into the hands of men selected to use it for our defeat at the polls [meaning that plaintiff had used money unlawfully to defeat the said *Peter Tubbs* for some office].   We always believed that this money came from Appleton [meaning the money set apart and intended for use in the lawful administration of the asylum] and was charged up to permanent improvements [meaning that plaintiff had caused such money to be charged up to and made part of the account or statement for permanent improvements], as the management [meaning this plaintiff] thought it would be a permanent improvement to eliminate us from the county board and further meddling

with asylum records.    One of the townsmen who chanced to
be in Appleton was interrogated with what kind of a man is
*Peter Tubbs.*    He is all right, I guess, was the reply.    Well,
says the interrogator, he is a mighty good man for Outagamie
county and a good man for Seymour, but Appleton don't like
him.    Well, really why.    Simply this, the great Diana of
Outagamie county [meaning this plaintiff] was in danger.
Now if you want to realize the full meaning of the situation,
then and today, read the nineteenth chapter of Acts in the
New Testament.    It tells the whole story.

"PETER TUBBS."

Defendants, in such publication, intended to refer to the
"Permanent improvement" account before mentioned, and
to plaintiff as "Diana," as was understood by the readers
thereof, and as the fact was, and charge him with concealing
from the public, by charges in the "Improvement account,"
unlawful expenditure of money to defeat *Mr. Tubbs* in his
canvass for election to a public office,—to his damage in the
sum of $7,000.

Defendants separately demurred for insufficiency and the
demurrers were sustained.

For the appellant there was a brief by *John Bottensek* and
*A. M. Spencer,* and oral argument by *Mr. Bottensek.*

For the respondents there was a brief by *O. E. Clark* and
*P. H. Martin,* and oral argument by *Mr. Martin.*

MARSHALL, J.    We are unable to, efficiently, follow the
logic of counsel for respondents in support of the decision
complained of.    It seems to proceed upon the theory that a
plaintiff must state a cause of action with technical accuracy
and unmistakable clearness in order to satisfy the test of suf-
ficiency.    Certainty to a common intent is all that is neces-
sary, generally, even, on a motion to make more definite and
certain.    On a challenge for insufficiency every reasonable
intendment is to be taken in favor of the pleading, all facts
deemed pleaded which are set forth expressly or are suggested

by fair inference from the particular and general statements, and the pleading held good for any judicial relief shown to be merited whether within the prayer for relief or the particular intent of the pleader.    Counsel argue as if it were required to be "certain to a certain intent in particular, precluding all argument, inference, and presumption against the party pleading," contrary to the letter and spirit of the Code and the established practice.    In an action for libel the pleading must be tested by the liberal rules applicable in general.    We will measure the complaint from that viewpoint.

This is elementary: "Any malicious publication, by printing or writing, or by signs or pictures, which accuses a person of a crime, blackens his character, or tends to expose him to public ridicule, contempt, or hatred, is libelous;" *Cramer v. Noonan,* 4 Wis. 231; *Scofield v. Milwaukee Free Press Co.* 126 Wis. 81, 105 N. W. 227; *Wandt v. Hearst's Chicago American,* 129 Wis. 419, 109 N. W. 70; or any such conduct which tends to prejudice a person in his legitimate business or imputes to him want of official integrity; *Wilson v. Noonan,* 23 Wis. 105; or causes him, in his official capacity, to be looked upon with distrust and bring him into disgrace; *Wilson v. Noonan,* 23 Wis. 105; *Buckstaff v. Viall,* 84 Wis. 129, 54 N. W. 111; *Adamson v. Raymer,* 94 Wis. 243, 68 N. W. 1000.

In connection with the definition, sec. 2677, Stats., is important.    It expressly dispenses in its letter with necessity for any statement of extrinsic facts, except where necessary to show the meaning of words used.    Features formerly required to show application to the plaintiff, are satisfied, commonly, by the general statement that the publication was made concerning the plaintiff.    In case of the language being so ambiguous as not, of itself, to reasonably point to the plaintiff, extrinsic facts are required; not to enlarge the meaning, but to enable one to read in connection with environing

circumstances giving direction to the libel. Otherwise such facts are only necessary to show that the language used, as it would ordinarily be understood under the circumstances, fairly suggests plaintiff as the objective, and includes the essential libelous elements.

The pleading here contains the general statutory allegation. It states facts calculated to clear up any ambiguity as to whether it is applicable to the plaintiff and capable of the libelous meaning ascribed. If there be ambiguity in it, such facts are material and possibly vital. Does the complaint, as a whole, giving to the alleged libelous words the ordinary meaning which might fairly be ascribed to them under the circumstances, show that they are fairly capable of being considered as pointing to plaintiff and having the libelous meaning ascribed to them or some other libelous meaning? That is the question. *Bradley v. Cramer,* 59 Wis. 309, 18 N. W. 268; *Robertson v. Edelstein,* 104 Wis. 440, 80 N. W. 724.

To aid as to the application of the article to respondents and capability of its being libelously understood, the pleader as, in general, is indicated in the statement, in substance, set forth these facts: 1st. During twenty years preceding the action plaintiff has been superintendent of the Outagamie county asylum for the chronic insane, located in the town of Grand Chute, and manager thereof, and as such had established a good reputation and enjoyed public confidence. 2d. Annually large sums of public money were, during such time, expended under plaintiff's immediate supervision, including sums for permanent improvements; the latter sums being customarily accounted for and reported under the head of "Permanent improvements," and the reports printed for information of the public. 3d. Defendants knew that fact and used the term "permanent improvements" with reference to such account, kept, reported, and published, and the word

"management" with reference to plaintiff's official status, and the word "Diana" as a characterizing meaning for him; and the libelous article was so understood by the public.

In view of the foregoing it seems that the word "management," in the publication, points, quite clearly, to appellant; the language of the article, "war was carried on at the expense of the county," suggests that plaintiff made war on defendant for personal revenge; corruptly using public funds under his charge to pay the expenses; the words, "money flowed freely into the hands of men selected to use it for our defeat at the polls," suggest that plaintiff's war was for personal revenge and took the course of his using public funds, corruptly, by placing the same in the hands of his agents to defeat the writer in a political contest for membership of the county board, and the words, "We always believed that this money came from Appleton," that it came from the depository of public funds, which was, by common knowledge, located in Appleton, and that the corrupt conduct was hidden from the people and, perhaps, the county board or those not in sympathy with plaintiff, by entries in his accounts fictitiously swelling the expenditures recorded under the head of "Permanent improvements."

The publication seems, not only to be capable, in general, of being understood as suggested, but probably was by readers in Outagamie county.

The inverse method, so to speak, of construction applied by respondents' counsel in testing the complaint, is best illustrated by their humorous analysis of this concluding language of the article: "The great Diana of Outagamie county was in danger. Now if you want to realize the full meaning of the situation, then and today, read the nineteenth chapter of Acts in the New Testament. It tells the whole story." We do not fail to appreciate counsel's humor, but, it is not persuasive on the subject under discussion. The quoted language, certainly, was not intended to give an innocent or compliment-

ary cast to what had preceded. On the contrary, it seems to have been used to emphasize the context by suggesting the Ephesian false conception of Diana beside the reality as typical of the real status of plaintiff, and that he and his followers were alarmed and resentful because of the writer's *exposé* of his false character, as were the Ephesians by Paul's uncloaking of their "hand-made god" Diana, and destructive exposure of false pretense. "The great Diana" is not uncommonly used to express contempt for superficial "magnificence." As applied here it gives the idea that, instead of plaintiff being what he pretended to be,—likened in his assumed official "magnificence" of character to the fraudulent greatness of Diana in Ephesian contemplation,—the acme of purity; "cold and severe in her chastity as the silvery light of the moon scattered over the mountain tops and forest glades; illuminating as the free light of heaven; all powerful to protect on earth against the dangers of the chase and, in subterranean regions, efficient to guard those condemned to tarry there against the innumerable ghosts,"—he was a hypocrite and that the public was suffering from a delusion as it did at Ephesus; that he had conceived himself to be in danger of *Mr. Tubbs* making the reality known as was the selfish master silversmith, Demetrius, from the teachings of Paul.

"It tells the whole story." What is the whole story of the Holy Word?—The picture of a false conception, a mere myth, an artificial character, falsely personified as pure and great and powerful, played upon credulous people as an actuality to sap their revenues, those who profit by the deception,—pecuniarily interested in its not being dispelled by the truth, blinded by self-interest and alarmed by a supposed impending stoppage of the flow of fruits of their deception into their pockets,—under stimulus of Demetrius, a chief beneficiary, while riotously striving to suppress the source of enlightenment, being admonished that if they had a real grievance against the Apostle,—Paul in the Bible story, *Mr. Tubbs*

in the modern instance,—to vindicate the right by judicial appeal to the law of the land or other appeal to a lawful assembly,—by simile, that if plaintiff deemed himself aggrieved by the writer's *exposé* of his false character, he should have proceeded in lawful ways for redress rather than by corruptly arousing the people to suppress the effort to extinguish his superficial "magnificence" and charging the expense out of the public money, cloaking it under his account for "permanent improvements."

Perhaps too much time has been spent on the reference to the history of the Acts of the Apostle and the environing circumstances and conditions. Measuring the publication from its suggestion to look for "the whole story," in harmony with the general trend of its language, it is capable of being regarded, as it may well have been by the readers, as a very severe characterization of appellant as a corrupt official and deceiver,—a man unworthy of public confidence, having a real, as far removed from his pretended, character as to be a proper subject for contempt and ridicule.

We must look at the pleading, assuming that plaintiff intended to state a cause of action for unjustly and libelously holding him up as indicated. From that viewpoint, all suggested respecting the publication, it is thought, may be reasonably read out of it. As before said, the characterization of plaintiff as a modern Diana is, of itself, suggestive of false pretense rather than possession of the virtues ascribed by the Ephesians to their idol. The author chose a very efficient way of telling "the whole story," suggested in outline in the language preceding the scriptural reference. He lit upon a most concise, caustic, and sarcastic method. It is capable, under the circumstances, of being understood as a very ingenious and scathing arraignment for reprehensible official misconduct, cloaked under superficial pretense of purity. So, we see no good way of escaping the conclusion that the complaint states a good cause of action, and that the mastery

of human analysis with which counsel presented the matter here turned the judicial view below out of its proper angle.

*By the Court.*—The order is reversed, and the cause remanded for further proceedings according to law.

TIMLIN, J. (*dissenting*). The statute relied upon by appellant, sec. 2677, Stats., has, I think, no bearing upon a complaint which sets forth the alleged libelous matter, when that matter so set forth, upon a fair construction thereof, excludes the plaintiff as the object of censure or attack. That, I think, is the case here. The plaintiff describes himself as one who now is and for more than twenty years last past has been the superintendent of the Outagamie county asylum for chronic insane, located in the town of Grand Chute in said county, and during all this time he has had the more immediate care and management of that institution under the general supervision of a board of three trustees, agreeable to the provisions of law in such cases made and provided and the direction of the county board. It is true that with this the plaintiff avers that Outagamie county, acting through its county board and the plaintiff as such superintendent, has expended money in building and repairs upon the asylum farm, and that to some considerable extent the direct supervision and charge of such building, etc., has been by the county board or by the trustees of the asylum imposed on the plaintiff, who has hired work and labor and ordered materials and merchandise for such buildings, etc., and at times has bought the same and rendered to the trustees statements therefor, all of which was generally known to and understood by the residents of Outagamie county. Ever since January 1, 1890, the trustees of said asylum have annually rendered to the county board a written report of the management of said asylum, and of this written report the annual report of plaintiff to the trustees as superintendent forms a considerable part. Such annual report invariably contained a statement or account of the money ex-

pended during the year for buildings, etc., which account is usually known in such report as "Permanent improvements" or as "Improvements,"· and such annual reports are from time to time and annually printed in pamphlet form and distributed among the residents of Outagamie county and to some persons in the state at large. The alleged libelous article is as follows:

"Seymour, Wis., Nov. 15, 1909.

"But years after, when we were trying to do good service for Outagamie county and rebuked the Crescent for its exaggeration in holding up our insane asylum as a money maker, we showed the public that the treasurer's books did not sustain the claims, and said we should not look to such institution for money making. But my, we excited the management, and war was declared and carried on at the expense of the county, and money flowed freely into the hands of men selected to use it for our defeat ·at the polls. We always believed that this money came from Appleton and was charged up to permanent improvements, as the management thought it would be a permanent improvement to eliminate us from the county board and further meddling with asylum records. One of the townsmen who chanced to be in Appleton was interrogated with what kind of a man is *Peter Tubbs*. He is all right, I guess, was the reply. Well, says the interrogator, he is a mighty good man for Outagamie county and ·a good man for Seymour, but Appleton don't like him. Well, really why. Simply this, the great Diana of Outagamie county was in danger. Now if you want to realize the full meaning of the situation, then and today, read the nineteenth chapter of Acts in the New Testament. It tells the whole story.

. "Peter Tubbs."

When the plaintiff shows that his management was under the general supervision of a board of trustees "agreeable to the provisions of law," he brings the case within the purview of sec. 604*a*, Stats., and shows that his "management" did not include the custody of county funds or the disbursement thereof. Sec. 604*b*, Stats. His duties were merely those legal duties of superintendent. But he hired work and

ordered materials and at times bought the latter, but handled no funds, and he annually reported to the trustees, who incorporated his report to them in their report to the county board. This report to the county board contained under the head of "Permanent improvements" a statement of money expended for buildings, etc. By whom expended? The plaintiff had the expenditure of no money; he merely hired workmen and ordered and at times bought merchandise, but all in the legal manner according to law. The report of the trustees to the county board was published and distributed, etc. Hence the use of the public funds of the county to defeat defendant for re-election as supervisor and member of the county board and charging up such disbursement to permanent improvements, which is the only suggestion of libel in the published article, does not refer to plaintiff, the latter being neither named nor otherwise described. Upon a fair construction of the published article, this indirect charge of an unlawful use of public funds refers to such use by others and excludes the plaintiff. The money so used came from Appleton, therefore not from plaintiff. It came from those who had the handling of public moneys, therefore not from plaintiff. It came from persons who had charge of public moneys which they might properly charge up to permanent improvements, therefore not from the plaintiff. It is nowhere averred that the account or subdivision of the circulated pamphlet which was headed "Permanent improvements" was in that part of such pamphlet which consisted of plaintiff's report to the trustees, and because it is averred that matters were being carried on according to law we must presume it was not in that part of the pamphlet. Sec. 2677 is a statutory rule of pleading, and it merely makes the averment there authorized a sufficient substitute for the "inducement and colloquium" of the common-law pleading. This statute cannot have the effect of changing the ordinary and natural meaning of words so as to make them libelous of the

plaintiff, where by their ordinary meaning plaintiff is excluded from their scope.    The words could not ordinarily be understood as applying to the plaintiff by the readers of the published article, even if such readers were acquainted with all the matters set forth concerning plaintiff's position and duties.

Mr. Justice KERWIN concurs in this dissent.