PULP WOOD COMPANY, Appellant, vs. GREEN BAY PAPER & FIBER COMPANY, Respondent.

*May 23—June 17, 1914.*

*Interstate commerce: Contracts: Construction: Validity: Restraint of trade: Statutes construed: Federal and state statutes: Combinations, when unlawful: Sales: Remedies of vendor: Pleading: Demurrer.*

1. A contract to furnish a manufacturer in this state with pulp wood coming from Wisconsin, Minnesota, Michigan, and the Dominion of Canada involves interstate commerce, and the question whether it is illegal because of being in restraint of trade is to be determined by the federal rather than the state statute.

2. A contract which contravenes public law is void and no recovery can be had thereon.

3. Where the sufficiency of a complaint is challenged by demurrer every reasonable intendment must be made in favor of the pleading.

4. Where a contract is fairly open to two constructions, by one of which it would be lawful and by the other unlawful, the former must be adopted.

5. The words "restraint of trade" as used in the federal anti-trust statute have the same meaning as at common law and in the law of this country at the time of its passage, and embrace only acts, contracts, agreements, or combinations which operate to the prejudice of the public interests by unduly restricting competition or by unduly obstructing the due course of trade.

6. Whether or not a particular contract contravenes the law depends on the extent to which competition has been restricted or trade has been obstructed, and this must be determined from the existing facts; when the facts are ascertained the question whether the restraint is reasonable or otherwise becomes one of law.

7. There is nothing in itself unlawful in two or more persons appointing a common agent to purchase a commodity which they require and in giving such agent the exclusive right to do the buying.

8. Such an arrangement becomes unlawful when it injuriously affects the public, that is, when it unduly restricts competition

or restrains trade, and this must ordinarily be made to appear from facts outside of the contract.

9. The producer of a commodity is entitled to protection against combinations which unreasonably depress the price of such commodity, even though the general public might to some extent benefit by the depression.

10. A contract which contemplated the supplying of pulp wood by plaintiff to twelve large paper manufacturers who used about twelve per cent. of the entire supply of pulp wood in the particular territory,—the season's requirements of each being estimated,—and which bound the defendant to buy pulp wood of no other person, is not, upon its face, unduly restrictive of trade, and hence not to be pronounced illegal upon demurrer to the complaint in an action brought thereon.

11. Where a complaint attempts to state several causes of action and defendant demurs generally to the whole complaint, if any good cause of action is stated the demurrer must be overruled.

12. The mere fact that a vendor corporation is an unlawful combination will not relieve the vendee from paying for goods purchased from it, provided the contract of purchase is not in itself unlawful.

13. Sec. 1747e, Stats., is substantially a copy of the federal anti-trust statute, restricted in operation to this state and with a lesser penalty, and it should receive the same interpretation that has been placed upon the federal act by the supreme court of the United States.

APPEAL from an order of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Reversed.*

This action arises out of a series of contracts made between the plaintiff and the defendant, whereby plaintiff agreed to supply the defendant with pulp wood for consumption at its paper mill. These contracts were made from year to year and covered the years 1904 to 1909 inclusive. A formal contract was not made covering the year 1909, but it is alleged that a contract was made by letter for that year similar to those covering previous years. The formal contracts are alike in terms except as to the amount of wood to be furnished and the so-called base price to be paid therefor. These contracts are attached to the complaint as exhibits and made a

part thereof. Exhibit "B," covering the year 1905, is printed and is as follows:

"Whereas, the *Pulp Wood Company* of Appleton, first party, has requirements during the year 1905 of 91,800 cords of pulp wood and has contracted to deliver to the Riverside Fiber and Paper Company 19,000 cords and the Thilmany Pulp and Paper Company 1,000 cords, and the Lindauer Pulp Company 1,650 cords, and the Outagamie Paper Company 3,500 cords during the same season, making a total of 116,950 cords, and

"Whereas, the *Green Bay Paper and Fiber Company* of Green Bay, the second party, has need during the season of 1905, for its own use, of 5,000 cords of spruce pulp wood, and 17,500 cords of hemlock pulp wood, and 2,000 cords of balsam pulp wood,

"Now, therefore, it is mutually agreed,

"First. That the first party will use due diligence to furnish to the second party said 5,000 cords of spruce pulp wood, and 17,500 cords of hemlock pulp wood, and 2,000 cords of balsam pulp wood, during said year, that being amount of the estimated requirements of the second party, all pulp wood to be of the quality and dimensions equal to that provided by the first party for its own use and for said third parties above-mentioned.

"Second. That the second party shall receive and pay for its *pro rata* share of the entire amount of pulp wood, which the first party shall of necessity deliver in order to operate economically, during the season of 1905, if in excess of the 141,450 cords above specified, based on the amounts above specified for delivery. And that it will accept its *pro rata* share of the pulp wood which the said first party is able to deliver during the season, if same is less than 141,450 cords, to the end that said second party shall acquit the first party of all liability for diminution in amount if the first party is not able to furnish the entire 141,450 cords. And that the first party shall be relieved of excess or surplus.

"Third. Said first party will receive and said second party will pay for said pulp wood its *pro rata* share of cost, including all expense of operating by said first party and seven per cent. interest on the capital employed in cutting, getting out

and delivering the 141,450 cords more or less of wood above specified.

"Fourth. Said first party shall deliver said pulp wood in the storage booms of the party of the second part at Green Bay, Wisconsin, either from raft or by scow at option of second party, and if, at any time, said storage booms are full, then said first party may deliver the above mentioned wood alongside said storage booms at the risk and expense of the second party. But it shall be optional with the first party as to whether all deliveries shall be made by water or part by rail, excepting that enough wood must be delivered from time to time by rail if necessary to keep second party's mill running, subject to clause fifth.

"Fifth. Delivery shall be made of said pulp wood from time to time to said second party *pro rata* with deliveries for the requirements of the first party and the requirements of the third parties mentioned.

"Sixth. On the second Monday following a Saturday's completed delivery, said second party shall and will pay to said first party on all wood not theretofore paid for as follows:

"On spruce pulp wood $9 per cord.

"On hemlock pulp wood $5.50 per cord.

"On balsam pulp wood $5.75 per cord.

"But if said second party shall choose to anticipate payment, it shall be entitled to credit at the rate of seven per cent. per annum, and if it shall not pay promptly on day for payment, it shall and will pay seven per cent. per annum for the time bill remains overdue.

"Seventh. Second party will not purchase any pulp wood from any person, firm or corporation other than as agreed above for use during the year 1905.

"Eighth. The scale of the first party taken at the points where the pulp wood is put in the water shall be final and conclusive upon both parties, as to all pulp wood delivered by water, excepting that the second party shall be entitled to the same percentage of reduction on the scale of the wood that is delivered to it as the diminution on the whole amount handled by water shall prove to be.

"Ninth. Each kind of wood shall be delivered separately, that is, one kind shall not be mixed with another.

"Tenth. A settlement shall be had at the end of the season,. and thereupon, the first party shall return to the second party, or the second party shall further pay to the first party such balance as there may be for or against the second party, on account that the price fixed in paragraph sixth for the pulp wood shall prove to be greater or less than the price as fixed by clause third.

"In witness whereof, the said parties have caused these presents to be signed in duplicate by their respective presidents and treasurers or secretaries this 22d day of December,. 1904."

The amended complaint alleges that the plaintiff is a corporation organized for the purchase and sale of pulp wood and that the defendant is a corporation engaged in the manu- facture of paper. The making of the various contracts be- fore referred to is then set forth. The complaint then al- leges that on September 25, 1903, the plaintiff entered into a contract with one Perry to enable the plaintiff to furnish. spruce pulp wood to its customers and that a copy of such. contract is annexed to the complaint. Certain modifications of the Perry contract are then set forth and said modifications. are also made a part of the complaint. The complaint then alleges that the defendant, before making the contract for the year 1904, knew of the contract with said Perry and knew of the modifications of said contract about the time the same were made, and that spruce pulp wood was delivered under· said contracts for the years 1904 to 1907 inclusive, to the amount stated in a schedule annexed to the complaint marked Exhibit 1. It is then alleged that on account of 4,201 cords. of spruce pulp wood delivered to the defendant for the year 1904 the sum of $37,058.05 was paid by the defendant, that. being the sum which appeared to be due at the time the calcu- lation for the cost of the wood for that year was made and supposed by the parties to be the contract price for the wood furnished, and that other like purchasers made payments on the same basis; that on account of the 5,549 cords of spruce· pulp wood delivered to the defendant under the 1905 con-

tract, $47,688.59 was paid by the defendant as the calculated cost of the wood furnished for that year, being the amount supposed by the parties to the contract to be the price therefor, and that other purchasers made a like payment; that payment was made on a like basis for 4,116 cords of pulp wood delivered for the year 1906; that in the year 1907 it became apparent that plaintiff would sustain a loss on the Perry contract and that such loss could not at that time be ascertained; that the 5,601 cords of spruce pulp wood delivered to the defendant under the contract for the year 1907 were partly settled for, such settlement being made on the same basis as for the three previous years, except that the parties left the loss on the Perry contract to be adjusted when the amount of the loss should be ascertained, and that the other purchasers made payments on the same basis; that in 1907 Perry refused to further perform or fulfil his contract and was then insolvent, and on April 13, 1910, was adjudged bankrupt on his own petition by the district court of the United States for the Western district of Michigan; that plaintiff lost through such failure the sum of $81,468.21, on account of advances made to him pursuant to such contract, which loss was not ascertainable until after September, 1910; that said plaintiff advanced to said Perry under said contract in the year 1907 a sum in excess of $110,000; that the failure of Perry and the consequent loss made the spruce pulp wood delivered by said Perry under his contract as modified cost the plaintiff $81,468.21 more than it would have cost if said Perry had carried out his contract; that the annual calculations of the cost of pulp wood made between the plaintiff and the defendant and other like purchasers were based on the expectation that Perry would carry out his contract as modified; that the total amount of spruce pulp wood delivered by the plaintiff to the defendant and other like purchasers under the contract for the year 1904 was 123,270 cords, the amount delivered to the defendant being 4,201 cords; that the total delivery for the year 1905 was 71,201 cords, of which amount 5,549 cords

were delivered to the defendant; that the total delivery for
the year 1906 was 71,373 cords, of which amount 4,116 cords
were delivered to the defendant; that the total delivery for
the year 1907 amounted to 73,124 cords, the amount deliv-
ered to the defendant being 5,601 cords; that the total amount
of spruce pulp wood delivered by plaintiff to all its customers
under said contracts for four years was 338,968 cords, and
the total amount of said wood delivered to the defendant was
19,467 cords; that at the time of the making of the contracts
declared on, the larger part of the stock of the plaintiff was
held and owned by parties interested in and holding stock in
corporations located in and operating mills requiring pulp wood
in the Fox River Valley between Neenah and Menasha and
Green Bay, to wit, Kimberly-Clark Company, Combined
Locks Paper Company, Kaukauna Fibre Company, Interlake
Pulp and Paper Company, and Little Chute Pulp Company;
that the clause in Contract "B" as follows: "First party has
requirements during the year 1905 of 91,800 cords of pulp
wood," and similar clauses in other contracts set up in the
complaint, relate to pulp wood which the plaintiff had agreed
to furnish said corporations; that the plaintiff in each year
in which it had contracts as alleged in the complaint procured
and brought pulp wood from Wisconsin, Michigan, Minne-
sota, and Canada; that a considerable part of the pulp wood
handled in each year by it was brought to the waters of Green
Bay, and that part of same delivered to the defendant was
delivered at the port of Green Bay, while that furnished to
other of its customers was shipped to them by rail from Long
Tail Point or floated up the Fox river to the mills of the pur-
chasers; that Exhibit 1 includes the list of names of all pulp-
consuming corporations in the Lower Fox River Valley below
Neenah and Menasha and above Green Bay; that the mills in
the Fox River Valley using pulp wood now draw and at
the times covered by this contract drew their supply of
pulp wood from northern Wisconsin, the northern peninsula

of Michigan, northeastern Minnesota, and quite a large territory in the Dominion of Canada; that said mills at the times herein mentioned used and now use less than twenty-one per cent. of all the pulp wood used by all the paper mills of Wisconsin using pulp wood; that not only the mills in Wisconsin, but other mills in Michigan, Minnesota, and Canada, drew at the times herein mentioned and now draw pulp wood from the same territory; that such other mills in Michigan, Minnesota, and Canada use and have at the times herein mentioned used more than twice the amount of pulp wood used by the mills in the Fox River Valley; that the mills in the Fox River Valley use and at the times herein mentioned have used about ten to twelve per cent. of all the pulp wood drawn from the said source of supply; that during all the times herein mentioned it was practicable for all of the aforesaid mentioned mills to procure their pulp wood from any portion of such territory; that some competitors of the Fox river mills, and especially those located in Canada, were and are more favorably located than said Fox river mills in respect to the cost of labor, the cost of transporting pulp wood to their mills, and the cost of the use of hydraulic power, the only power ordinarily used for manufacturing pulp and products thereof; that the procurement of pulp-wood timber requires the use of a suitable logging outfit, and the work of woodsmen and loggers' camps, and the transportation of pulp wood cut to the places where it is to be used; that neither the plaintiff nor any of the parties with whom it contracted owned loggers' outfits, nor did the plaintiff log the timber sold by it, but contracted therefor with loggers for the purpose of procuring the same for less than it would necessarily expend in doing the work ordinarily done by loggers; that by contracting for a large amount of pulp wood and for the transportation thereof plaintiff was able to procure and deliver wood at the mills in the Fox River Valley for less than the same could have been procured by the Fox river mills contracting

separately; that such saving in cost enabled the Fox river mills to sell their pulp-wood products to the public at prices proportionately less than they otherwise could and thereby meet the prices of competitors more favorably located in the particulars mentioned; that the plaintiff's articles of association limit its capital stock to $90,000; that the products of the twelve Fox river mills mentioned were and are selling in free competition and to local buyers at the same prices as were and are charged to members of the public in general; that there is and has been for ten years no considerable amount of pulp wood within 100 miles of the Fox River Valley; that within 200 miles of the Fox River Valley there is not pulp wood enough to supply the Fox river mills for more than four or five years; that if the loss on the Perry contract be distributed among the plaintiff's customers for the years 1904 to 1907 inclusive, the defendant's share of the loss would be $4,678.74; that if said loss be apportioned to contracts for the year 1907, the year in which the advances were made to Perry, for which an equivalent in spruce pulp wood was not delivered by Perry, defendant's share of said loss would be $6,240.13. Judgment is demanded on the first cause of action for the larger amount.

The second cause of action is one to recover the sum of $11,595.58 for interest charges because of the failure of the defendant to receive wood on its contracts when tendered to it by the plaintiff, by reason of which the plaintiff was compelled to carry a large amount of money for an unnecessary length of time in the wood purchased by it before receiving returns thereon, and also for balance due on the contract price of said wood. It is unnecessary to set out in detail the allegations of the complaint on this cause of action.

The third cause of action is one to recover an alleged balance claimed to be due on the wood delivered to the defendant under the contract for the year 1909, which contract was made by letter. Under the Perry contract Perry agreed to

cut on lands tributary to the Tequamen on the south shore of Lake Superior 200,000 cords of spruce pulp wood and deliver the same to the plaintiff during a period of five years. This contract contained the following clauses:

"Eighth. The said company further agrees that it will not buy or attempt to buy of any company or person other than said Perry any spruce pulp wood to be carried by water down the Tequamen river or between Sault Ste. Marie, Michigan, and White Fish Point on the shore of Lake Superior during the term of this contract."

"Ninth. Said Perry further agrees that he will not, during the term of this contract, buy or attempt to buy any spruce pulp wood at any point outside the points above specified wherein the purchaser is not to buy or attempt to buy, Canadian wood excepted."

The defendant interposed a demurrer to the amended complaint on the ground that it did not state facts sufficient to constitute a cause of action. From an order sustaining such demurrer the plaintiff appeals.

For the appellant there were briefs by *Hooper & Hooper,* attorneys, and separate briefs by *Wm. Ruger,* of counsel, and the cause was argued orally by *Mr. Moses Hooper* and *Mr. Ruger.*

For the respondent there was a brief by *Martin, Martin & Martin,* and oral argument by *P. H. Martin.*

BARNES, J. The defendant contends that the contracts sued on are void under the federal Anti-Trust Act, 26 U. S. Stats. at Large, 209, ch. 647 (3 U. S. Comp. Stats. 1901, p. 3200), which is as follows:

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on

conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court."

Further, that such contracts were made in violation of secs. 1791*j* and 1747*e*, Stats. of Wis., which statutes read as follows:

"Sec. 1791*j*. Any corporation organized under the laws of this state which shall enter into any combination, conspiracy, trust, pool, agreement or contract intended to restrain or prevent competition in the supply or price of any article or commodity in general use in this state, or constituting a subject of trade or commerce therein, or which shall in any manner control the price of any such article or commodity, fix the price thereof, limit or fix the amount or quantity thereof to be manufactured, mined, produced or sold in this state, or fix any standard or figure by which its price to the public shall be in any manner controlled or established, shall, upon proof thereof, in any court of competent jurisdiction, have its charter or authority to do business in this state canceled and annulled. Every corporation shall upon filing its annual report with the secretary of state, make and attach thereto the affidavit of its president, secretary or general managing officer, fully stating the facts in regard to the matters specified in this section."

"Sec. 1747*e*. Every contract or combination in the nature of a trust or conspiracy in restraint of trade or commerce is hereby declared illegal. Every person who shall combine or conspire with any other person to monopolize or attempt to monopolize any part of the trade or commerce in this state shall forfeit for each such offense not less than fifty dollars nor more than three thousand dollars. Any such person shall

also be liable to any person transacting or doing business in this state for all damages he may sustain by reason of the doing of anything forbidden by this section."

The circuit court held that sec. 7 of the contracts by which the contracting consumers agreed not to purchase any pulp wood from any person, firm, or corporation except the plaintiff, unlawfully restrained trade, in that it took twelve consumers of wood out of the market and operated to the disadvantage of those who had pulp wood to sell by reducing the number of competing buyers.

The principal contention made by respondent's counsel in their brief and on the oral argument is that the contracts evidence a plan or scheme on the part of the contracting parties to control and restrict the output of pulp and paper, to the end that the market might be manipulated and prices raised, and that such purpose is made manifest by the fact that twelve or thirteen large consumers of pulp wood have bartered away their rights from year to year for a series of years to supply their legitimate wants in the way of raw material. It is urged that the plaintiff is a spurious creature, organized for ulterior purposes and to evade the law, and that the real power behind it is a group of manufacturers intent on unduly stimulating competition or suppressing it altogether, as may best suit their lawless wishes, and that the inevitable tendency of the contracts is towards monopoly and unlawful restraint of trade.

The complaint shows that the wood supply furnished to the plaintiff came from the states of Wisconsin, Minnesota and Michigan, and the Dominion of Canada. The contract we think involved interstate commerce, and if so the federal statute is applicable and the case will be treated on that basis. *U. S. v. Reading Co.* 226 U. S. 324, 33 Sup. Ct. 90; *Swift & Co. v. U. S.* 196 U. S. 375, 25 Sup. Ct. 276; *U. S. v. Patten,* 226 U. S. 525, 33 Sup. Ct. 141; *Continental W. P. Co. v. Louis Voight & Sons Co.* 212 U. S. 227, 29 Sup. Ct. 280.

So far as this particular case goes, we observe very little difference whether the state or federal statutes or both apply.

The case will first be considered on the aspect principally relied on by respondent's counsel and in reference to the so-called Sherman Anti-Trust Law.

The questionable features of the contracts arise out of the fact that they take in twelve or thirteen large consumers of wood and that these consumers have appointed an agent who has the exclusive authority to buy all their pulp wood.

We do not construe the contracts as fixing a price which the plaintiff was to pay for wood. The prices specified in the sixth paragraph are merely an estimate, made in advance, of what the commodity would probably cost, and payment was to be made on the basis of this estimate as the wood was delivered. When the total expense for the year was ascertained, the purchasers were to settle on the basis of the actual cost, which included seven per cent. interest on the capital employed by the plaintiff. If the estimated price was greater than the actual cost the excess was to be refunded by the plaintiff. If the actual exceeded the estimated cost the purchasers were required to make up the deficiency and pay in proportion to the amount of wood purchased. This we deem to be the clear intent and meaning of paragraph 10 of the contract and of the provisions of the same taken as a whole. No other contract could be made if the actual purpose was to secure a supply of wood. The contracts covered future deliveries for a period of a year. Many conditions might arise which would materially affect the supply of wood. A good winter for hauling would tend toward a large supply and a lower price, while an open winter would greatly curtail output and tend to increase the price. The varying conditions of the wood market are reflected in the estimated prices found in the contracts. The estimated price of spruce was $2 per cord higher for 1907 than for 1905, and of hemlock $1.50 per cord higher. The plaintiff would have to pay the going

prices whatever they were or go without wood.   Its net earn-
ings were restricted to seven per cent. on the capital it had
invested.   We do not understand that there is any serious
dispute between the parties as to the intent and meaning of
the contract in this regard.   Neither do we think there is
any doubt that the manufacturers who were parties to con-
tracts like that set forth in the statement of facts attempted
to make the plaintiff their sole agent and to give it the ex-
clusive right to purchase their supply of wood.   If it appears
from the contracts, read in connection with the allegations of
the complaint, that the parties had no lawful right to make
such agreements, or that the agreements contravene public
law, then the contracts are void and the action will not lie
because recovery cannot be had on a void contract.   *Menomi-
nee River B. Co. v. Augustus Spies L. & C. Co.* 147 Wis.
559, 132 N. W. 1118.

The complaint being challenged by demurrer, every reason-
able intendment must be made in favor of the pleading.
*Downer v. Tubbs,* 152 Wis. 177, 179, 139 N. W. 820; *Jones
v. Monson,* 137 Wis. 478, 119 N. W. 179.

"In law every intendment that harmonizes with honesty
and fair dealing must be presumed in the light of the alleged
facts."   *Forest Co. v. Shaw,* 150 Wis. 294, 304, 136 N. W.
·642.

Where a contract is fairly open to two constructions, by
one of which it would be lawful and the other unlawful, the
former must be adopted.   *Hobbs v. McLean,* 117 U. S. 567,
576, 6 Sup. Ct. 870; *U. S. v. Cent. Pac. R. Co.* 118 U. S.
235, 6 Sup. Ct. 1038, cited in *Watters v. McGuigan,* 72 Wis.
155, 157, 39 N. W. 382; *Hicks P. Co. v. Wis. Cent. R. Co.*
138 Wis. 584, 591, 120 N. W. 512.

"When the terms of a contract are indefinite, uncertain, and
susceptible of two constructions, and by giving them one con-
struction one of the parties would be subjected to a forfeiture,
and by giving them the other no such forfeiture would be in-

curred and no injustice would be done to the other party, the contract should be so construed as not to create the forfeiture." *Jacobs v. Spalding,* 71 Wis. 177, 190, 36 N. W. 608; *Weidner v. Standard L. & A. Ins. Co.* 130 Wis. 10, 19, 110 N. W. 246; *Hicks P. Co. v. Wis. Cent. R. Co.* 138 Wis. 584, 590, 591, 120 N. W. 512; *Appleton Iron Co. v. British Am. Assur. Co.* 46 Wis. 23, 1 N. W. 9, 50 N. W. 1100; *Wier v. Simmons,* 55 Wis. 637, 13 N. W. 873.

A violation of the federal Anti-Trust Act is made a misdemeanor which is punishable by a fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both, in the discretion of the court.

"It is a most fundamental canon of criminal legislation that a law which takes away a man's property or liberty as a penalty for an offense must so clearly define the acts upon which the penalty is denounced that no ordinary person can fail to understand his duty and the departure therefrom which the law attempts to make criminal." *Brown v. State,* 137 Wis. 543, 119 N. W. 338.

It is substantially ruled in some of the federal courts that in close and doubtful cases arising under the Anti-Trust Law and involving intricate questions, the merits will not be passed upon on demurrer nor until all the essential facts are before the court, where such facts may materially aid in determining whether or not the law has been violated. *U. S. v. Winslow,* 195 Fed. 578, applying the equity rule as stated in *Kansas v. Colorado,* 185 U. S. 125, 144, 145, 22 Sup. Ct. 552. This rule of practice is not binding on this court, but does not differ essentially from our uniform holdings in later years as to when a complaint will be held bad on general demurrer.

There is not so much difficulty at the present time in determining what the law is as there is in making the proper application of established rules to the facts in each particular case. There has been a world of decisions on our anti-trust laws, common and statute, in the state and federal

courts. To attempt to review them all would be a work of supererogation. To harmonize them would be an impossibility. On the federal Anti-Trust Statute, however, our court of last resort has recently spoken in a number of well considered decisions in which the act of Congress has been carefully and learnedly analyzed and its scope defined. *Standard Oil Co. v. U. S.* 221 U. S. 1, 31 Sup. Ct. 502; *U. S. v. American T. Co.* 221 U. S. 106, 31 Sup. Ct. 632; *U. S. v. Patten,* 226 U. S. 525, 33 Sup. Ct. 141; *Standard S. M. Co. v. U. S.* 226 U. S. 20, 33 Sup. Ct. 9; *U. S. v. Reading Co.* 226 U. S. 324, 33 Sup. Ct. 90; *Swift & Co. v. U. S.* 196 U. S. 375, 25 Sup. Ct. 276; *U. S. v. Terminal R. R. Asso.* 224 U. S. 383, 32 Sup. Ct. 507; *Northern S. Co. v. U. S.* 193 U. S. 197, 24 Sup. Ct. 436; *Montague & Co. v. Lowry,* 193 U. S. 38, 24 Sup. Ct. 307; *Continental W. P. Co. v. Louis Voight & Sons Co.* 212 U. S. 227, 29 Sup. Ct. 280. Many other cases might be cited, but a reference to them will be found in the foregoing decisions.

Whatever understanding or misunderstanding may have arisen out of the decisions in *U. S. v. Trans-Missouri F. Asso.* 166 U. S. 290, 17 Sup. Ct. 540, and *U. S. v. Joint Traffic Asso.* 171 U. S. 505, 19 Sup. Ct. 25, it is now definitely decided that the words "restraint of trade" at common law and in the law of this country at the time of the adoption of the Anti-Trust Act embraced only acts, contracts, agreements, or combinations which operated to the prejudice of the public interests by unduly restricting competition or by unduly obstructing due course of trade, and that Congress intended that those words used in the act should have a like significance. *Standard Oil Co. v. U. S., supra; U. S. v. American T. Co., supra.* These decisions have been freely criticised and often denounced, but they are the law of the land. It is more than three years since they were announced, during which time Congress has been in almost continuous session. So far as we know there has not even been any attempt to pass a law de-

claring that every contract, combination, or conspiracy in restraint of trade is unlawful regardless of the extent of the restraint. We are inclined to agree with respondent's counsel that in the discussion of these cases "the light of reason" has "often been absent."

The real question before us for solution is: Do the contracts referred to, read in connection with the allegations of the complaint, show that they operated to the prejudice of the public interest by unduly restricting competition or by unduly obstructing the due course of trade?

The answer depends on the extent to which competition has been restricted or trade has been obstructed. This must be determined from the existing facts. When the facts are ascertained the question of whether the restraint is reasonable or otherwise is one of law. *Richards v. American D. & S. Co.* 87 Wis. 503, 513, 58 N. W. 787. Sometimes the essential facts may be so clearly shown by the contract involved, if one is involved, that further evidence is unnecessary to show that the restraint is unlawful. There is another class of cases where the contract in itself may present an innocent appearance, but when considered in the light of other facts and circumstances, including the purpose for which it was made, the objects sought to be accomplished and the results actually brought about, the contract may be positively vicious. In such cases the contract constitutes a link in the chain of evidence. There is a third class of cases where the contract involved shows some restriction of competition or some obstruction of trade, but does not show whether such restriction or obstruction is undue and unreasonable or otherwise. In such cases it is necessary to resort to evidence *dehors* the contract to ascertain whether it is void or valid.

The contracts involved in this case would seem to fall within the latter class. If they are reasonably susceptible of an interpretation which would render them lawful, it is the duty of the court to place that interpretation upon them. It is

argued by counsel for respondent that these contracts place a limitation on the production of pulp and likewise on the output of paper; that there is a federation of interests between the contracting parties; that estimates of the amount of wood required are made so as to effectuate the ulterior purposes of the parties, or it may be the group itself makes the estimates; that the power is centered in this group to dominate the pulp and paper market; that plaintiff is merely a clearing-house for carrying out the unlawful objects of the combine; that the contracts referred to give the plaintiff power to crush competitors and force combinations; that they inevitably tend toward monopoly; that an unlawful restraint is placed upon the contracting consumers, in that they are not permitted to buy any part of their supply of wood under any circumstances. Some other considerations of like tenor and effect are suggested, but the foregoing is a substantially full epitome of the contentions of counsel on the point principally argued. These contracts are roundly and at times extravagantly denounced by counsel.

Defendant asks us to assume altogether too much in passing upon these contracts and the averments of the complaint. This is not an action brought by or in behalf of the public to dissolve an unlawful combination. It is a case where one *particeps criminis* is trying to avoid responsibility to his copartners in crime, if any crime was in fact committed. In berating the plaintiff the defendant is also belaboring itself. It is true, it had no stock in the plaintiff corporation, but if the corporation was organized for an unlawful purpose, the defendant aided, abetted, and assisted it in the execution of such unlawful purpose. The contracts before us covered a period of six or seven years. If the production of pulp wood and of paper was restricted for the purpose of inflating the price of paper or depressing the price of wood, the defendant is as well aware of that fact as is any one else, and whether it is or not the matter is easily susceptible of proof. The de-

fendant certainly knows how long its mill was shut down for want of pulp wood if it was shut down at all.  It can be readily ascertained how long the other mills whose owners made like contracts were shut down for this or any other cause during the period.  If no attempt was in fact made during this time to restrict output so as to squeeze up prices abnormally or to do other unlawful acts, that would be pretty convincing evidence that the plaintiff corporation was not organized to juggle the paper market.  If the plaintiff has crushed or attempted to crush competitors, or has forced or attempted to force unlawful combinations to control the wood or paper market, these things should be susceptible of proof, but it is not apparent from the contracts or from the complaint that it has done either.

For aught we know it may be shown on the trial that the contracting manufacturers made their estimates large enough to cover their needs without interference from any one; that the estimated amounts were substantially furnished, or that a good-faith attempt was made to supply them; that the exercise of that reasonable diligence which plaintiff agreed to exercise was sufficient to insure a full supply of wood, or at least as much as the mill owners could secure if they were themselves engaged in the work of buying; that the mills affected had all the wood they needed at all times, and that there was no thought of restricting the output of paper or pulp and that there was no restriction in fact and no influence exerted on the paper market whatever by this alleged unlawful combine.  It might even be made to appear that the only harm which the parties could do, if they attempted to reduce production, would be to themselves.  It might also be made to appear that the plaintiff was organized to further legitimate economies in the cost of the article which the mill men had to offer the consuming public.  Manifestly the question under consideration cannot be intelligently decided until the actual facts are before the court, because the complaint and contracts

do not affirmatively establish the fact that there has been any undue restraint of competition or any undue obstruction of the course of trade.   It is possible to imagine many things that might have happened, but the vital question here, after all, is, What has been done?   The court should not be asked to draw on its imagination for its facts.   The plaintiff has been operating long enough so that its practices should be well known.   We do not think the contracts on their face inevitably tend to unduly restrain trade or competition.

There is nothing in itself unlawful in two or more persons appointing a common agent to purchase a commodity which they require and in giving such agent the exclusive right to do the buying.   *Nat. D. Co. v. Cream City I. Co.* 86 Wis. 352, 56 N. W. 864; *Kellogg v. Larkin,* 3 Pin. 123; *Wheeler-Stenzel Co. v. American W. G. Co.* 202 Mass. 471, 476, 89 N. E. 28; *Burley T. Soc. v. Gillaspy* (Ind.) 100 N. E. 89; *Reeves v. Decorah F. G. Soc.* (Iowa) 140 N. W. 844; *First Nat. Bank v. Missouri G. Co.* 169 Mo. App. 374, 152 S. W. 378; *Central S. R. Co. v. Cushman,* 143 Mass. 353, 9 N. E. 629; *New York T. R. Co. v. Brown,* 61 N. J. Law, 536, 43 Atl. 100; *Arkansas B. Co. v. Dunn,* 173 Fed. 899; *Anderson v. U. S.* 171 U. S. 604, 613, 614, 19 Sup. Ct. 50; *Connolly v. Union S. P. Co.* 184 U. S. 540, 22 Sup. Ct. 431, read in connection with additional facts stated in dissenting opinion of Justice HOLMES in *Continental W. P. Co. v. Louis Voight & Sons Co.* 212 U. S. 227, 29 Sup. Ct. 280.   We do not wish to be understood as approving all that is said in those cases.

Such an arrangement becomes unlawful when it injuriously affects the public, or, in other words, when it unduly restricts competition or restrains trade.   Ordinarily the invalidity of such an agreement must be made to appear from facts outside of the contract, because the writing seldom shows the facts necessary to determine whether the restraint is reasonable and permissible or undue and criminal.   The circuit

court thought the contract was unlawful because it took a dozen consumers of wood out of the market and thus materially affected those who had pulp wood for sale, by reducing the number of buyers. The idea of the court was that the contracts had a tendency to reduce the price of wood. This is a contention not very often made in this class of cases, because, if true, it would also have a tendency to reduce the price at which the manufactured article might be sold to the consuming public. However, we think the pulp-wood producer is entitled to protection against combinations which unreasonably depress the price of his commodity, even though the general public might to some extent benefit by the depression.

The complaint shows that the mills for which plaintiff acted as agent used about twelve per cent. of the entire output of wood in the territory in which it made its purchases. It cannot be held as a conclusion of law on these facts that there was an undue restraint of competition. The producers of wood have made no complaint on this score. There may have been an abundance of buyers to insure fair and free competition in bidding and a fair and adequate price for the wood. If so, it could not be said that competition was unduly restricted. The question is one calling for evidence to show how and to what extent it was reasonably probable that those who had wood for sale were affected.

The first cause of action is brought to recover a loss sustained on the Perry contract. The effect of that contract on this cause of action has not been much discussed by counsel. There are three causes of action stated in the complaint, and the demurrer is interposed to the whole complaint, so that if any good cause of action is stated the order appealed from is erroneous. We do not deem it necessary to decide on the validity of that contract, or to what extent, if any, it would affect the plaintiff's right of recovery on its first cause of action should the contract be held void.

The mere fact that the plaintiff corporation was an un-
lawful combination would not relieve the defendant from
paying for the goods purchased from it, provided the contract
of purchase was not in itself unlawful. *Nat. D. Co. v.
Cream City I. Co.* 86 Wis. 352, 56 N. W. 864; *Connolly v.
Union S. P. Co.* 184 U. S. 540, 22 Sup. Ct. 431; *Interna-
tional H. Co. v. Eaton Circuit Judge,* 163 Mich. 55, 127 N.
W. 695; *Chicago W. P. Mills v. General P. Co.* 147 Fed.
491.    This being the law, it is not apparent how the defend-
ant can derive any benefit from sec. 1791*j*, Stats. of Wis.

Sec. 1747*e,* Stats. of Wis., is a copy of the federal stat-
ute, except that it applies to attempts to monopolize trade
and commerce within the state and prescribes a lesser penalty
for its violation than is provided for in the act of Congress.
It originally appeared as ch. 219, Laws of 1893.    Since then
it has received substantially the same construction, *sub silen-
tio* at least, that was placed on the federal law in the *Stand-
ard Oil* and *Tobacco Cases,* as will be seen from an examina-
tion of the following cases decided since the law was enacted:
*Cottington v. Swan,* 128 Wis. 321, 107 N. W. 336; *My
Laundry Co. v. Schmeling,* 129 Wis. 597, 109 N. W. 540;
*Kradwell v. Thiesen,* 131 Wis. 97, 111 N. W. 233; *Burton
v. Douglass,* 141 Wis. 110, 123 N. W. 631; *Eureka L. Co.
v. Long,* 146 Wis. 205, 131 N. W. 412; *Ruhland v. King,*
154 Wis. 545, 143 N. W. 681; *Nat. D. Co. v. Cream City
I. Co., supra; Richards v. American D. & S. Co.* 87 Wis. 503,
58 N. W. 787; *Tecktonius v. Scott,* 110 Wis. 441, 86 N. W.
672.    If the above statute has any application to the facts
in this case, it should receive the same interpretation that was
placed on the federal act, from which it was taken, by the su-
preme court of the United States.

*By the Court.*—Order reversed, and cause remanded for
further proceedings.

KERWIN, J., took no part.